ALAN B. MARCUS AND JUDITH B. MARCUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marcus v. Commissioner
Docket No. 3615-84.
United States Tax Court
T.C. Memo 1988-3; 1988 Tax Ct. Memo LEXIS 3; 54 T.C.M. (CCH) 1452; T.C.M. (RIA) 88003; January 4, 1988. Morton S. Robson and Kenneth N. Miller, for the petitioners. Victoria Wilson Fernandez and George H. Soba, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioners' tax for 1976 and 1977 in the amounts of $ 88,990.48 and $ 27,642.09, respectively. The issues are (1) whether gains and losses from certain commodity straddle transactions should be disallowed; (2) whether petitioners are entitled to a causalty loss deduction in excess of that allowed by respondent for a fire in their residence; and (3) whether petitioners are entitled *8 to deduct employee promotional expenses in excess of those allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Petitioners resided in Rosyln, New York, at the time they filed their petition. During the years at issue, petitioner Alan Marcus ("Mr. Marcus") was an investment broker employed by Bear, Stearns & Co. ("Bear Sterns"). He has been registered as a security broker since 1962. He became registered as a commodity representative in 1975. He has had experience in the full range of brokerage and investment business. During the years at issue his primary business was trading stocks and other investment vehicles as a broker for his customers. For convenience, our remaining findings of fact and opinion will be grouped according to the issues to which they relate. I. LONDON OPTIONS ADDITIONAL FINDINGS OF FACT Mr. Marcus has traded for his personal account, as well as for accounts of customers. In 1975 he began trading for his personal account stock option straddles that were traded on regulated domestic exchanges. *9 In 1976 and 1977 Mr. Marcus [1] allegedly [2] entered into commodity transactions that were described on the sales confirmations and monthly account statements as puts and calls for "London Tin" and "London Coffee". (Those alleged transactions hereinafter sometimes will be referred to as London options.) In disallowing the gains and losses from London options reported on petitioners' tax returns, respondent's statutory notice of deficiency stated: the gains and losses claimed by [petitioners] in 1976 and 1977 with respect to the alleged coffee and tin transactions cannot be recognized because it has not been established that the gains and losses occurred or occurred in the manner claimed. The transactions at issue were shams or devoid of the substance necessary *10 for recognition for federal income tax purposes. Further, the claimed gains and losses are disallowed because they do not clearly reflect income. Recognition of the claimed gains and losses would distort the economic reality of the entire transaction. No genuine gains and losses occurred, the alleged gains and losses were but one step in a series of integrated transactions, and the entire transaction lacked economic reality. * * * Additionally, the claimed loss is disallowed because of the lack of any profit motive with respect to the alleged coffee and tin transactions. The notice of deficiency summarized the gains and losses from London options reported on the tax returns and disallowed respondent as follows: London Tin
Ordinary
1976
$ (102,918.00)
London Coffee
Ordinary
1976
( 69,257.00)
$ (172,175.00)
London Tin
Capital
1976
$ (  4,275.00)
London Coffee
Capital
1976
(  5,611.00)
$ (  9,886.00)
London Tin
Ordinary
1977
$   10,732.90 London Coffee
Ordinary
1977
(206,943.60)
London Coffee
Ordinary
1977
18,906.55 [3] $ (198,769.95)
London Tin
Capital
1977
$   79,648.75 London Coffee
Capital
1977
285,434.95 [4] $  365,083.70 *11 Petitioners reported on their tax returns ordinary and capital gains and losses from London options that net to a loss of $ 15,747.25 for the two years involved herein. Mr. Marcus invested in London options upon the recommendation of the *12 retail manager of Bear Stearns' commodity department, Norman Turkish. Norman Turkish's office was on the same floor as Mr. Marcus' in 1976. At the time Mr. Marcus opened the London option account, he perceived that Norman Turkish had a "fantastic reputation for being a very successful commodity trader." Norman Turkish also was considered a specialist in trading straddles for the purpose of deferring taxes on income. Before investing in London options, Mr. Marcus received two typed reports, each two pages in length and ending with "Norman A. Turkish" and "June, 1976." Those reports described general predictions for the coffee and tin markets and discussed the potential to profit from buying straddles in coffee and tin futures. Those reports also stated that tin is traded on the London Metal Exchange, Western Hemisphere Coffee is traded on the New York Coffee and Sugar Exchange, and African Robusta Coffee is traded on the London Terminal Market. Pursuant to those reports and to conversations with Norman Turkish, Mr. Marcus agreed to invest in coffee and tin commodities. Account statements from Bear Stearns reflect that trading in London options for Mr. Marcus' account commenced *13 on June 28, 1976. Account statements further reflect that on July 2, 1976, Mr. Marcus paid an initial deposit of $ 15,000 to Bear Stearns for the London option account. The London option account was a discretionary account, so that Bear Stearns had full discretion over the account. Mr. Marcus could give no instructions at all regarding the account except to direct the firm to close the account and liquidate all the positions held therein.
Options
In order to limit his risk of loss, however, Mr. Marcus desired that the account was to buy options contracts only, not actual futures contracts. [5] According to Mr. Marcus' account statements, the account held both calls and puts. A call option gives the holder (the buyer) the right to buy from the grantor (the seller or writer) a specified quantity of a commodity at a specified price (the strike price) [6] on or before the option's expiration date. [7] A put option gives the holder the right to sell to the grantor a specified quantity of the commodity at a specified strike price on or before the expiration date. *14 The holder of an option contract has a right but not an obligation to sell or purchase the commodity at the strike price. Although the grantor of an option may be subject to unlimited risk, the holder is never at risk for more than the cost of the option. [8]
The price of an option itself (the premium) is a function of three factors: the nearness of the strike price to the cost of the underlying commodity, the expectations regarding future costs for the commodity, and the lenth of time before the option expires. During the years at issue, commodity options were not traded on United States commodity exchanges.
Straddles
Mr. Marcus understood that the options that were to be in his account might be held as straddles. [9] A straddle is established by simultaneously holding a "long" position (a call to buy the commodity) for one expiration date and a "short" position (a put to sell *15 the commodity) for another expiration date. The two separate positions are called the "legs" of the straddle. The profit or loss potential of a straddle is not based on absolute price movements in the legs, but instead is measured by the increase or decrease in the price differential between the puts and calls. The price movement for one month rarely will equal the price movement for the other month; the difference between the movements in price produces the gain or loss on the straddle. As a general rule, as the period of time between the expiration months in a straddle increases, the potential for profit and the risk of loss also increase. If a put or call is not held in a straddle configuration (i.e., the position is unhedged), the potential for profit arises solely from the risk that the value of the single option will increase or decrease. A holder of a straddle has both a put and a call, so fluctuation in the price of the underlying commodity typically results in a gain in one leg of the straddle and a loss in the other. After a fluctuation in the price of the underlying commodity, a straddle holder sometimes makes *16 a "switch" transaction. A switch occurs when one leg of the straddle is "closed out" [10] and is replaced by purchasing an option identical to the one closed out (i.e., for an identical quantity of the same commodity), except for a different expiration date. A switch of a straddle theoretically enables a holder to close out the loss leg and offset the loss recognized against ordinary income or capital gain from another source, while holding the gain leg open until a later year with an offsetting rehedge to protect the unrealized gain. This technique theoretically results in both tax deferral and conversion of ordinary income into long term capital gain. *17 London Metals Exchange
As stipulated by the parties, the findings of this Court in Glass v. Commissioner,87 T.C. 1087 (1986), concerning the operations and functionings of the London Metals Exchange ("LME") shall apply to this case. We incorporate by this reference those findings and, in the interest of brevity, shall reiterate only those findings material to our decision. The LME was established in 1877. Cash, future, and option contracts in tin and other metals are traded on the LME. LME trade prices are expressed only in pounds sterling. Unlike United States exchanges, the LME does not operate as a clearing house for trades. Rather, all transactions on or subject to the rules of the LME are executed principal-to-principal, and the LME may be described as a "principal's market." Thus, a purchaser (or a seller) of an option or futures contract through a broker/dealer in effect purchases that contract from (or sells it to) the broker/dealer. Broker/dealers normally "lay off" their trades; i.e., they also will enter into a second offsetting contract with another party whenever they enter into one contract. The LME does not require broker/dealers to *18 lay off trades; however, those broker/dealers who do not lay off are said to be "running a position" (taking a risk) in the market. Because the LME operates as a principal's market, there is no accurate financial data that summarizes the transactions entered into by the various broker/dealers. Although estimates of trading volume are reported in the London Financial Times, such estimates do not reflect a substantial amount (approximately eighty percent) of the trading that takes place on the LME. Another significant difference between the LME and United States Commodity exchanges is the LME's lack of limits on price changes for the traded metals. Prices are free to fluctuate on the LME as market conditions dictate. Margin payments provide insurance to brokers/dealers that losses in a customer's account will be satisfied. "Initial margin" (or initial deposit) is the amount of money which a broker/dealer may require from a customer before initiating trading for the customer. "Maintenance margin" is the amount of funds that a broker/dealer might require a customer to pay after trading commences. A broker/dealer makes a margin call on a customer when additional funds are *19 required as security for the customer's account. During the years at issue, the LME had no margin requirements, except for certain long-term silver futures contracts that are not present in our case. Thus, the amount of margin, if any, is subject to negotiation between the broker/dealer and the customer, although margin normally is based upon the value of outstanding contracts and lower for straddle positions than for the riskier unhedged positions. Also, the absence of a margin requirement on the LME allows broker/dealers to begin trading for a customer before receiving any initial deposit. Bear Stearns was not a member of any London exchange during the years at issue. J. H. Rayner (Mincing Lane) Ltd. (hereinafter referred to as Rayner), a subsidiary of S & W Berisford Ltd., acted as Bear Stearns' agent in London, handling any London options transactions for Bear Stearns and its customers. Petitioners received no cash income from the investment in London options, nor have they recouped any part of the $ 15,000 invested. In October of 1977 or 1978, subsequent to Mr. Marcus' London options transactions, Norman Turkish was convicted of evading income taxes, of filing false *20 income tax returns, and of conspiracy to defraud the United States. The conspiracy charge was a result of Norman Turkish's involvement in a conspiracy to fix and prearrange commodity future transactions in the Crude Oil Futures Market through the use of straddles. [11]
OPINION The first issue for decision is whether petitioners' gains and losses on the London options should be disallowed. Respondent makes three arguments in the alternative on this issue. First, he asserts that the gains and losses claimed with respect to the London options should be disallowed because petitioners have not established that the transactions actually occurred (i.e., he argues that the transactions were not authentic). Second, respondent contends that, even if the transactions occurred, they should be disregarded for tax purposes because they were shams, structured as a prearranged tax avoidance scheme that lacked economic substance. Last, respondent argues that the gains and losses should be disregarded because the transactions were not entered into with a profit *21 motive. In regard to respondent's first argument, petitioners counter that respondent has not raised in the pleadings the issue of the authenticity of the transactions; thus, the issue is not before the Court. Even if the authenticity of the transactions is properly before the Court, petitioners assert that respondent, pursuant to Rule 142(a), [12] has the burden to prove the transactions are not authentic and that respondent has not met his burden. Petitioners contend that respondent has such a burden of proof because the authenticity issue, if ever properly raised by respondent, only was raised subsequent to the notice of deficiency. Furthermore, petitioners assert that, even if they have the burden to prove the authenticity of the transactions, they have met the burden. In regard to respondent's other arguments, petitioners assert that they have shown that (1) *22 the London options were not shams, and (2) Mr. Marcus invested in the London options for the purpose of making a profit, and, thus, the transactions should not be disregarded for tax purposes. [13]
Respondent's determinations in the notice of deficiency are presumptively correct, and petitioners have the burden to prove otherwise. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). We find that petitioners have not met their burden, and we uphold respondent's determination that all gains and losses from London options should not be recognized and should be disallowed. The issues before the Court in Glass were similar to those before us in the instant case. In Glass the Commissioner argued that straddle transactions on the LME were not bona fide, were economic shams, and were not entered into by the taxpayers with a profit motive. In our opinion in Glass, we did not reach the issue of the transactions' authenticity. Rather, we found *23 it unnecessary to determine the bona fides of the transactions and instead focused our attention "not on questions of fact but on a question of law. If [LME straddle] losses are unallowable under a paradigm set of facts as postulated by petitioners, then the question of whether petitioners have introduced enough evidence to prove that the transactions are authentic becomes moot." 87 T.C. at 1172. We ultimately concluded that the London options transactions in that case were shams. 87 T.C. at 1176-1177. In the instant case we also need not determine the authenticity of the transactions, since petitioners have the burden of proof on the sham and profit motive issues, and they have not shown how, if at all, their transactions differed from those of the taxpayers in Glass.
Before moving to our discussion, we pause to note that we have seen no evidence in this case to indicate that any non-metal commodities, such as coffee, ever were traded on the LME. One of the 2-page reports given to Mr. Marcus does indicate that coffee was traded on the Lodnon Terminal Market. [14] Also in evidence is a Bear Stearns request to Rayner for information regarding London *24 options, which request indicates that Bear Stearns perceived that the coffee transactions occurred on the London Coffee Terminal Market. Petitioners, however, have offered no evidence whatsoever in regard to the procedures or the regulations, if any, of the London Terminal Market or the London Coffee Terminal Market, if the two documents were not referring to the same market. For that matter, except for the above mentioned references in those two stipulated exhibits, petitioners make no mention of any Terminal Market in London. Petitioners' arguments and briefs seem to imply that no difference existed between tin transactions, which would have occurred on the LME, and coffee transactions, which certainly would not have occurred on the LME. Since petitioners have offered no evidence regarding the coffee market and imply that there is no difference between coffee and tin transactions, we shall treat the coffee transactions as if they occurred on a market similar to the LME. Such an assumption, however, will not alter our findings and decision below. *25 Sham Transactions Petitioners' basic contention in regard to the London options is that they have distinguished their case from Glass. In support thereof, petitioners offered several Bear Stearns' documents as well as sales confirmation slips and monthly statements for Mr. Marcus' London options account. [15] The Bear Stearns documents in evidence, however, do not provide any basis that would allow us to distinguish between the London options transactions in Glass and those involved herein. *26 In the Glass case extensive documentation and testimony from LME dealers were a part of the record. In the instant case however, petitioners have offered no documents from London that may be traced to Mr. Marcus' London transactions.[16] Petitioners also have not offered testimony from any dealers or brokers, either from London or from Bear Stearns in New York, who might have knowledge about the London options or who might be able to distinguish Mr. Marcus' transactions from those in Glass. The paucity of proven facts about the overseas transactions in the instant case causes us to be skeptical that Mr. Marcus' transactions differed in any significant way from those in Glass. See Julien v. Commissioner,82 T.C. 492, 501 (1984). In Glass, we held that LME option *27 transactions were shams because they were a series of transactions having no business or profit-making function apart from obtaining tax deductions. 87 T.C. at 1176. We found that the only profit-making function, beyond tax savings, of an investment in London options could be to obtain a "profit from a 'difference' gain in excess of commissions and other costs upon the completion of his commodity trading." [17]87 T.C. at 1173. Other than Mr. Marcus' testimony, the only evidence in the record at all pertinent to the profit-making function of the London options are the two 2-page reports that generally describe the tin and coffee markets. Both 2-page reports were stipulated by the parties without any reservation of objection to the truth of the matters alleged therein; however, the reports do not discuss the particulars of trading in those commodities. The reports only summarily explain how the commodity transactions discussed therein might *28 generate economic profits. No evidence was presented to corroborate the assertions in the 2-page reports, and, even in conjunction with the other documents in evidence, the two 2-page reports remain insufficient to explain how Mr. Marcus could have profited economically. For that matter, we have seen no evidence to indicate that the transactions in Mr. Marcus' account actually were conducted pursuant to the strategy discussed in the reports. In short, the paucity of evidence leaves us unconvinced that, after commissions and other costs are considered, a profit even could have been made with the trading strategy used in Mr. Marcus' London options account. Mr. Marcus was the only witness for petitioners. He testified, "When [the London option transactions] were set up, I had no understanding whatsoever of what was being done." He was not familiar with the London market, did not understand all of the techniques, and relied on "people [he] trusted" at Bear Stearns, especially Norman Turkish. Yet, neither Norman Turkish nor any of the other "people" on whom Mr. Marcus relied were called by petitioners as witnesses to explain the London option transactions. We cannot assume *29 that the testimony of absent witnesses would have been favorable to the party with the burden of proof; indeed, the normal inference is that the testimony would be unfavorable. Blum v. Commissioner,59 T.C. 436, 440 (1972); Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Mr. Marcus testified that he understood that his account would buy only options in order to limit his risk of loss. Respondent's expert witness, on the other hand, interpreted the monthly statements sent to Mr. Marcus to show that underlying futures contracts or commodities, not just options, were bought and sold in the account. Furthermore, petitioners did not contradict this characterization by respondent's expert. [18] The purchase of futures contracts or commodities would have increased Mr. Marcus' risk of loss far beyond the $ 15,000 advanced by him to open the account. [19] In fact, his January 1977 monthly statement shows his account had a net deficit of several hundred thousand dollars *30 at month's end. [20] Yet, peculiarly enough, no margin calls were made on Mr. Marcus. Petitioners do not explain satisfactorily either the reason for the account having such a large deficit after such a small investment or the reason no additional margin was required of them. [21] The inference we draw from these seeming incongruities is that the substance of the underlying transactions did not comport with the transactions as represented by petitioners. *31 We also note that there is a remarkable correlation between the $ 15,000 initial margin deposit paid to Bear Stearns and the overall net loss "realized" by Mr. Marcus on his London options transactions. During the two years Mr. Marcus was involved in London options, petitioners' tax returns show total gains on individual closed tin and coffee transactions of $ 1,494,498.96 and total losses on individual closed transactions of $ 1,510,733.21. [22] The net of these two totals yields a net loss of $ 15,748.25. We find it an amazing coincidence that although the individual transactions generated over $ 3 million in total claimed gains and losses, the net total loss was only $ 15,748.25, merely a few hundred dollars more than Mr. Marcus' initial deposit. Petitioners do not comment upon this coincidence at all. For that matter, we have seen no evidence to indicate that Mr. Marcus ever paid the $ 748, more or less, by which his net losses surpassed his initial margin deposit. *32 In Forseth v. Commissioner, 85 T.C. at 155-156, 159-160 (1985), affd. sub nom. Mahoney v. Commissioner,808 F.2d 1219 (6th Cir. 1987), affd. without published opinion sub nom. Bramblett v. Commissioner,810 F.2d 197 (5th Cir. 1987), affd. sub nom. Enrici v. Commissioner,813 F.2d 293 (9th Cir. 1987), affd. without published opinion sub nom. Wooldridge v. Commissioner,800 F.2d 266 (11th Cir. 1986), we held that purported LME straddles were shams because, inter alia, (1) positions were entered into for the taxpayers before they posted any margin, and (2) the taxpayers' initial margin deposits roughly equaled the excess of total losses over total gains "realized" by the taxpayers on their commodity trades. Both of those factors are also present in the case before us. In affirming Forseth, the Sixth Circuit noted that the "zeroing out" of all margin accounts was "just too convenient to be explained away by the long arm of coincidence." Mahoney v. Commissioner,808 F.2d at 1220. The Sixth Circuit also noted other indicia pointing to a sham, several of which are present in our *33 case: the conspicuous lack of concern over adequacy of margin, the lack of margin calls, and the complete discretion accorded to London dealers for a highly risky investment -- commodity speculations. 808 F.2d at 1220. In short, the unexplained remarkable correlation between Mr. Marcus' initial deposit and his net "realized" loss, as well as the factors noted by the Sixth Circuit that are present herein, imply that Mr. Marcus' transactions were shams and devoid of economic substance. Last, we note the comments of the Court in Glass,87 T.C. at 1175-1176, in regard to LME straddle strategies similar [23] to those of Mr. Marcus: Could petitioners have profited from difference gains in commodity straddle transactions had they not in every instance entered into closing transactions on sold options in year one of the straddle operation? Since the answer to this question must be "yes," it must follow that there was no business or profit-making purpose behind the sold option closing transactions above and beyond tax deductions. The intentionally realized losses in year one were not necessary or helpful in profiting from difference gains in petitioners' *34 commodity straddle transactions. Put in this light, the London options strategy was "a mere device which put on the form of [commodity option and futures transactions] as a disguise for concealing its real character," the obtaining of unallowable loss deductions. As such, the London options transaction lacked economic substance and was a sham. [Emphasis in original.] [Fn. ref. omitted.] In conclusion, we have not found necessarily that the transactions were shams. Rather, due to the incompleteness of the record in this case, we cannot say with any certainty whether Mr. Marcus' transactions differed from those on which losses were disallowed in Glass. Our inability to draw that conclusion, however, is irrelevant. We only need to conclude whether petitioners have carried their burden to show that respondent's disallowance was improper. Rule 142(a). Petitioners certainly have not carried that burden. However, since we conclude only that petitioners failed to prove the transactions were not shams, not that the transactions definitely were shams, we also shall give an additional basis for rejecting petitiones' claims. Profit Motive
*35 Glass was the first case to consider section 108 of the Deficit Reduction Act of 1984, 98 Stat. 630, after that provision was amended by section 1808(d) of the Tax Reform Act of 1986, 100 Stat. 2817.[24] (Hereinafter we shall refer to section 108, as amended, as section 108.) We described section 108 and stated, "New section 108(a) allows losses sustained by investors in straddle transactions if incurred in a transactions entered into for profit." Glass v. Commissioner,87 T.C. at 1175. See also Freytag v. Commissioner,89 T.C. 849 (1987). Petitioners have shown us no evidence whatsoever to indicate that the London options herein were not straddles as contemplated in section 108. Indeed, the testimony of Mr. Marcus and respondent's expert, as well as the various documents in the record, all characterize the transactions herein as straddles, and we hold that section 108 applies to the instant case. *36 We held in Glass that section 108 does not permit loss deductions in the first year of commodity straddle transactions when the sham involves a series of transactions which have no economic significance (i.e., profit-making function) beyond the expected tax benefits. 87 T.C. at 1176. Thus, we could end our discussion here on the issue of London options. Nevertheless, since our holding that the London option transactions were shams rested on petitioners' failure to carry their burden of proof, and not on the fact that the transactions were shown to be shams, we shall analyze section 108 and offer an additional basis for rejecting petitioners' claimed losses. Glass v. Commissioner, supra at 1167, summarized section 108 as follows: In summary, then, amended section 108 traces the pattern of the loss provisions of section 165(c)(1) and (2), and makes it clear that losses incurred by commodities dealers trading in commodities are deductible under section 108 since they are losses incurred in a trade or business. Investors, on the other hand, must meet the test of loss incurred in a transaction entered into for profit. In the context of commodity *37 straddle transactions, the investor language parallels the section 165(c)(2) language which we construed in Smith [v. Commissioner,78 T.C. 350, (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987)] and Fox [v. Commissioner,82 T.C. 1001 (1984)], and (except as to commodities dealers) we think the effect of amended section 108 is to revalidate our holdings in those cases. * * * We therefore must review our holdings in Smith and Fox to understand the test for deductibility under section 108. In Smith v. Commissioner, supra at 394, we held that investors [25] in "butterfly straddles" of commodity futures "lacked the requisite economic profit objective necessary to enable them to deduct their commodity tax straddle losses." In Fox v. Commissioner, supra at 1021, 23 disallowed loss deductions to investors in "vertical spreads" on U.S. Treasury bill options and held that loss deductions are permitted only for "transactions entered into primarily for profit," and "for those essentially tax-motivated transactions which are unmistakably within the contemplation of congressional *38 intent." We applied these standards in Freytag v. Commissioner,89 T.C. at 884-885: The initial question that arises under our holdings in Smith and Fox is whether these transactions were "unmistakenly within the contemplation of congressional intent" for affording special tax consideration. * * * the economic raison d'etre for these transactions was to permit the customers to speculate on interest rates. But rank speculation is generally not considered the type of investment that Congress has sought to foster, and petitioners have not shown us expressions of congressional intent to encourage investments of this nature. Furthermore, we doubt seriously that Congress would ever encourage a speculative device where the primary by-product is to shift *39 income from one year to another. Thus, under the Smith and Fox analyses, petitioners must show that their primary motivation in entering into these transactions was for economic profit. The instant case is consonant with Freytag in that the only economic justification for the existence ("raison d'etre") of Mr. Marcus' investment in tin and coffee options could be to permit speculation on the price fluctuations of the options and the underlying commodity. Mr. Marcus certainly had no intention of becoming a manufacturer or dealer of those commodities. Also, petitioners have not shown any unmistakable congressional intent to allow deductions for straddle losses by investors who did not have a primary profit motive. Thus, as in Freytag, petitioners must show that Mr. Marcus' primary motivation in entering into London option transactions was for economic profit. Rule 142(a). Petitioners admit that Mr. Marcus unquestionably was aware of the tax treatment regarding straddles. They also have stipulated that Norman Turkish was considered a specialist in trading straddles for the purpose of deferring income taxes. Without a doubt, Mr. Marcus considered the prospect of *40 favorable tax consequences when he invested in the London options. The question we must answer, however, is whether Mr. Marcus' primary motive, independent of tax savings, was the desire for economic profit. Malat v. Riddell,383 U.S. 569, 572 (1966); Fox v. Commissioner,82 T.C. at 1022. In order to show Mr. Marcus' primary profit motive, petitioners offer only Mr. Marcus' testimony and the two 2-page reports from Norman Turkish that generally described the coffee and tin markets. In our determination of whether Mr. Marcus engaged in London options with a profit motive, however, all of the relevant facts and circumstances are to be taken into account. Siegel v. Commissioner,78 T.C. 659, 699 (1982). Greater weight, though, should be given to the objective facts than to Mr. Marcus' self-serving testimony regarding his intent. Fox v. Commissioner, supra at 1022; Siegel v. Commissioner, supra;Dreicer v. Commissioner,78 T.C. 642, 645 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The objective facts before us do not indicate that Mr. Marcus' primary *41 interest was the desire for economic profit. See Fox v. Commissioner, supra at 1023. In Glass,87 T.C. at 1174, we discussed LME strategies that appear indistinguishable from those used in Mr. Marcus' account: There can be no real dispute that the tax centerpiece of the London options transactions was the closing of the sold option in year one with an ordinary loss objective and the moving of the offsetting capital gain to a subsequent year. The London option trades were consciously effected with this in mind. Petitioners no doubt realize that, given the complexity of trading in commodity options and futures and the relatively high cost of commissions, profiting from difference gains in amounts sizable enough to make the enterprise worthwhile is a difficult and hazardous undertaking at best. It follows logically, then, that the intentional skewing of the transactions to realize year one losses introduces an additional negative element which prohibitively stacks the deck against the chances of significant financial success. Petitioners argue that under the London options transactions there was a reasonable prospect for a profit. This argument *42 conveniently overlooks the fact that in the critical year -- the loss year -- there was no prospect for any profit, for any other result would have destroyed the raison d'etre for entering into the London options transactions in the first place. [Emphasis in original.] There are other indications that Mr. Marcus' profit motive was not primary. We find it odd that Mr. Marcus, an experienced Wall Street stockbroker, never attempted to understand the transactions occurring in his London options account. [26] Mr. Marcus also testified that he had no way to verify the terms or the prices of the options as represented on his statements except by indirect reference to the United States coffee market. [27]
*43 The 2-page reports from Norman Turkish discuss a potential to profit if the coffee and tin markets behave as the reports suggest. Mr. Marcus, however, did not investigate further the tin and coffee markets. He testified that he never received any written projection or prospectus other than the general 2-page report; he simply relied on whatever Norman Turkish represented to him. Petitioners have not presented any expert testimony or any other evidence to corroborate Norman Turkish's assertions in the reports regarding the commodity markets. Also, petitioners presented no evidence regarding whether a profit even could be made on London options after commissions and other costs are considered. Indeed, the absence of such evidence leads to an inference that Mr. Marcus did not know the true profit potential, if any, of the London options. If Mr. Marcus did not know whether he even could (not whether he definitely would) profit on the London options, we find it inconceivable that he could have had a profit motive. Taken together, these facts indicate that if Mr. Marcus had an interest in a potential economic gain, it was only minor -- not his primary motive. Therefore, pursuant *44 to our holdings in Smith, Fox, Glass, and Freytag, we find that Mr. Marcus has not shown that he had the requisite profit motive. Rule 142(a). We therefore uphold respondent's determinations in regard to London options. II. FIRE LOSS ADDITIONAL FINDINGS OF FACT Petitioners suffered serious fire damage to their home in May, 1977. [28] Petitioners recovered $ 24,960 from their fire insurance company as reimbursement for personal and household possessions damaged in the fire. On their 1977 tax return petitioners claimed a casualty loss for expenses and losses to personal and household possessions [29] as follows: Fire loss - 5/16/77
$ 89,000
Less-insurance received
24,960
$ 64,040
Adjuster's Fee
6,892
Boarding Charges
400
Storage & Removal
3,300
Legal Fees
500
Total fire loss on destruction
of residence
$ 75,132
*45 Petitioners' tax return reflected properly the $ 100 limitation per casualty required by section 165(c)(3). Petitioners based their claimed property loss of $ 89,000 upon a schedule prepared by petitioner Judith Marcus (hereinafter Mrs. Marcus) a few days after the fire. Mrs. Marcus, with the assistance of an insurance adjuster, had surveyed the house and listed on the schedule all of the items in the house. The schedule listed all items in each room of the house and assigned a dollar value to each item. The schedule does not contain any indication of the ages of the items or of the original costs of the items. Respondent, in the statutory notice of deficiency, allowed petitioners a casualty loss deduction of $ 30,000, and disallowed the balance ($ 45,132) of the claimed loss. OPINION The next issue for our determination is whether petitioners are entitled to a casualty loss deduction in any amount greater than that allowed by respondent. Respondent's determination has the presumption of correctness, and petitioners have the burden of proving it wrong. [30] Rule 142(a). We hold for respondent because petitioners have failed to prove that they suffered a casualty *46 loss in any amount greater than that allowed by respondent. Section 1.165-7(b)(1), Income Tax Regs., provides the rule for determining the amount deductible with respect to nonbusiness casualty losses, such as petitioners', as follows: (b) Amount deductible. (1) General rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for the purposes of section 165(a) shall be the lesser of either -- (i) The amount which is equal to the fair market value of the property immediately before the casualty *47 reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in section 1.1011-1[,Income Tax Regs.,] for determining the loss from the sale or other disposition of the property involved. Petitioners claimed total losses from and expenses caused by the fire of $ 100,092 [31] before insurance. Respondent in effect allowed petitioners $ 54,960 [32] of those claimed losses. In support of their case, petitioners forward their own testimony, the schedule of items in the house prepared soon after the fire by Mrs. Marcus and the adjuster, and a folder of various receipts from 1976 and 1977. Petitioners' testimony on this point is admissible evidence, even though they are not expert appraisers. Harmon v. Commissioner,13 T.C. 373, 383 (1949). [33] Petitioners' testimony, however, although not at all fatal to their claim, [34] *48 does not suffice to prove their claim. See Millsap v. Commissioner,46 T.C. 751, 760 (1966), affd. 387 F.2d 420 (8th Cir. 1968). Rather, we would require additional evidence, besides petitioners' self-serving lay testimony, to overcome respondent's determination herein. The schedule of personal and household items lists a dollar value beside each item; however, petitioners have presented no evidence to substantiate the values assigned to each item by petitioners. Mrs. Marcus testified that the value of each item on the schedule was determined by reference to the age and original cost of the item: brand new property, "just bought", was valued at 100 percent of cost; other "brand new" property was *49 valued at 80 percent of cost; other property up to two years old was valued at 50 percent of cost; and all property over two years old was valued at one third of cost. There is no indication on the schedule, however, of the ages and original costs of any item. For that matter, we have no indication that the methodology used to determine the value of each item even gave a reasonable approximation of fair market value at the time of the fire. Testimony from an expert, such as an adjuster from a fire insurance company, would have been very cogent in our inquiry into the reasonableness of petitioners' methodology. Even if we assume that the methodology used in preparing the schedule was reasonable, we are not convinced that petitioners satisfactorily proved their case. The original cost of each item apparently was provided by Mrs. Marcus. She testified, "I happen to be also a very good shopper and * * * I know about costs of things that I bought." Mrs. Marcus also apparently provided the ages of each item. Neither the ages nor the original costs, however, are shown on the schedule, so no mathematical check can be made of the extension and computation of the individual values. *50 The omission of the ages and costs is especially significant in determining the accuracy of the schedule, given Mrs. Marcus' testimony that "I'm not so good with numbers." We are unwilling to accept the schedule's values of the damaged property for another reason. We are not convinced that the values on the schedule necessarily are reduced to the lower of petitioners' bases in the property or diminution in value caused by the fire. For example, the folder of receipts in evidence contains a charge receipt, dated January 24, 1976, for two sportcoats at a cost of $ 55 each and in the total amount of $ 117.70 after the addition of sales tax. Mrs. Marcus' schedule lists 5 sports jackets; however, each is assigned a value of $ 135. The inventory does not include any sportcoats valued at or below the $ 55 (or $ 58.85 including tax) cost of those purchased in January, 1976, and petitioners do not comment upon or explain this inconsistency. [35]
*51 The adjuster who went through the house with Mrs. Marcus might have helped her with the computational aspects of the schedule. The adjuster also might have helped petitioners prove their case had he testified. His testimony might have substantiated the reasonableness of the schedule's methodology. His testimony also might have supported Mrs. Marcus' naked assertions regarding the ages and original costs of the items on the inventory. In addition, the adjuster's testimony might have indicated that the items on the inventory were completely destroyed and had no residual value -- a particular that petitioners have not attempted to show, [36] except to the extent of their unsubstantiated testimony. Finally, the adjuster's testimony might have helped explain to us why petitioners were reimbursed only $ 24,960 by their insurer after they suffered a loss that they allege exceeds $ 100,000. [37] Petitioners do not suggest that the adjuster was unavailable for testimony; thus, we may infer that his testimony would have been unfavorable to petitioners. See Blum v. Commissioner,59 T.C. at 440. *52 Petitioners have introduced into evidence a folder containing about 25 sheets of paper, each of which has several receipts and charge slips stapled to both sides of it. Petitioners' counsel asserted at trial that the bills totaled about $ 28,000; however, petitioners have not summarized the receipts in any orderly fashion whatsoever. [38] Furthermore, Mr. Marcus' testimony at trial indicates that certain of the receipts are duplications of others in the folder, and respondent's brief suggests that the costs on the receipts are in certain cases lower than the values for those same items on petitioners' inventory schedule. Even if we assume arguendo that the receipts total $ 28,000 and that they all represent the fair market value of damaged property immediately before the fire, the receipts nevertheless substantiate only approximately 51 percent of the $ 54,960 loss allowed by respondent, and even a smaller percentage of the $ 89,000 property loss claimed on petitioners' tax return. [39] These receipts do not alter our conclusion that petitioners have failed to prove respondent's determination incorrect. *53 Petitioners also claimed a fire loss deduction for adjuster's fees, boarding charges, storage and removal, and legal fees. Although we have at times allowed casualty loss deductions for clean-up expenses, e.g., Steinert v. Commissioner,33 T.C. 447, 450 (1959), petitioners have presented no evidence whatsoever that any of these costs were for clean-up expenses. Furthermore, petitioners have shown us no evidence or authority whatsoever that would authorize a deduction for these expenses. [40] Last, petitioners have not even shown that respondent did not allow some portion of these expenses in determining the allowable deduction. In conclusion, petitioners have not shown that they are entitled to a casualty loss deduction any greater than that allowed by respondent. Rule 142(a). We thus hold for respondent on this issue. For convenience and to avoid unnecessary repetition, our remaining findings of fact and opinion will be combined. III. TRAVEL AND ENTERTAINMENT EXPENSES The *54 last issue for decision is whether petitioners are entitled to deductions in excess of those allowed by respondent for "Promotional expenses-lunches-gifts-flowers-etc. for clients relating to production of income." (Hereinafter we often shall refer to those expenses as promotional expenses.) The promotional expenses were claimed as relating to Mr. Marcus' employment as a stockbroker. Petitioners claimed deductions in the total amount of $ 19,200 for promotional expenses on their 1976 tax return. Respondent disallowed certain of the expenses claimed for 1976 as follows: Cash -- 2/7/76
$ 115
EST Training
250
Amer. Express
201
House Party - 6/12/76
1,250
House Party - 7/3/76
125
Trip to Schandakin Inn
192
Garden Voyage
200
Cash/Hertz
186
Actualization
250
Raleigh Hotel
106
Cash - 12/13/76
950
GSR - gifts
300
Amer Express & Cash
1,250
$ 5,375
Petitioners claimed deductions for promotional expenses in the total amount of $ 17,800 on their 1977 return. Respondent disallowed all of petitioners' 1977 deductions for: expenses of hosting three meetings of an Investment Club ($ 412 total); twenty percent of the cost of a trip to California taken *55 by petitioners during which they vacationed and visited customers of Mr. Marcus residing in California ($ 360 deducted); a Personal Growth Seminar ($ 250); a tuxedo rented by Mr. Marcus from Jack and Co. ($ 37); and gifts to clerks working in the order room and other Bear Stearns employees ($ 935). Those disallowed deductions total $ 1,994. The remainder of the $ 17,800 claimed by petitioners for 1977 was for business meals and entertainment, of which respondent disallowed $ 2,190. Petitioners have the burden of proving respondent's determination incorrect. Rule 142(a). Section 162(a) requires that business expenses be ordinary and necessary to be deductible. The deductibility of entertainment expenses is limited further by section 274(a) [41] to items directly related to or associated with the active conduct of the taxpayer's trade or business. During the years at issue, section 274(e)(1) provided an exception to section 274(a) for business meals furnished under circumstances conducive to a business discussion. *56 Respondent nevertheless disallowed certain of petitioner's claimed deductions, asserting that the expenses were not substantiated properly, as required by section 274(d). Section 274(d) requires that such expenses be substantiated by adequate records or sufficient evidence to corroborate the amount of the expenditure, the time and place of the activity, the business purpose, and the business relationship of the person entertained. Except for Mr. Marcus' testimony, petitioners have forwarded no evidence whatsoever to substantiate the promotional expenses claimed for 1976. They have not put into evidence any checks, receipts, or other documentary evidence pertaining to 1976. Respondent's revenue agent testified that he examined Mr. Marcus' 1976 diary of business expenses before making a decision that some of the expenses were substantiated sufficiently. Mr. Marcus' 1976 diary, however, is not in evidence before us. Mr. Marcus testified that his accountant had moved to California and that he "cannot get ahold of [the] '76 diary." Petitioners, however, offered no evidence to explain why Mr. Marcus could not have reclaimed the diary before the accountant's departure. Petitioners *57 have shown us no justification why Mr. Marcus should be relieved of his duty to retain records sufficient to substantiate his claimed entertainment expenditures. See sec. 1.274-5(c), Income Tax Regs.; sec. 1.6001-1(e), Income Tax Regs. Although Mr. Marcus may have had the diary when he was examined by respondent's agent, section 1.6001-1(a) and (e), Income Tax Regs., requires that records sufficient to establish the amount of deductions "shall be retained so long as the contents thereof may become material in the administration of an internal revenue law." (Emphasis supplied.) Obviously, the records must be retained until completion of proceedings in this Court. A trial before this Court is a proceeding de novo; our determination of petitioners' tax liability must be based on the record before us and not on any records used at the administrative level. Davis v. Commissioner,65 T.C. 1014, 1022 (1975); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 328 (1974). Since the record before us includes no corroboration whatsoever of the 1976 expenses, we find that Mr. Marcus' uncorroborated testimony is insufficient to substantiate the deductions *58 disallowed by respondent. See LaForge v. Commissioner,434 F.2d 370, 372 (2d Cir. 1970), remanding on the issue 53 T.C. 41 (1969). We therefore sustain respondent's determination in regard to 1976 promotional expenses. A copy of Mr. Marcus' 1977 diary is a part of the record. The diary is composed of sheets from a daily desk calendar on which were written amounts and notations designating the amounts as being for lunch, dinner, snack, parking, drinks, etc. The calendar pages also contained names of persons beside most of the entries. Many of the entries were accompanied by copies of charge slips, restaurant receipts, or other corroborating evidence, e.g., ticket stubs from movies or admission tickets to jail alai games or horse racing tracks. Mr. Marcus' 1977 diary had entries for approximately 316 meals, [42] not including the California trip and the Personal Growth Seminar. Meals were listed on 254 different days; [43] 54 of the days had entries for two meals, and 4 of the days showed entries for three meals. The expenses listed on the diary for those meals totaled a little over $ 16,000. Mr. Marcus took a deduction for $ 15,806, or over 95 *59 percent, of the total meal expenses listed in his diary. The diary, however, was very scant in describing the business purposes of any of these meals or entertainment. In general, only the name or names of Mr. Marcus' companions were shown in the diary, if any description was given at all. Besides the diary, the only other evidence of the business purpose of the meals and entertainment is Mr. Marcus' testimony: *60 "I was developing my business and obviously I was doing it successfully, and I took people out, customers who I was doing business with to get more business, people who I wasn't doing business with to get business and so on and so forth." He did not elaborate or offer further evidence, however, as to the business purpose behind any specific meal. Respondent disallowed only $ 2,910 of the $ 15,806 claimed for meals and entertainment on petitioners' tax return. Based on the evidence before us, we find that this determination by respondent is more than reasonable. The requirements imposed by section 274 are in addition to those imposed by section 162, and petitioners shall have the burden of proving initially that the expenditures were ordinary and business expenses, proximately related to the trade or business. [44]Sanford v. Commissioner,50 T.C. 823, 826 (1968), affd. 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). Petitioners only vaguely asserted any specific business purpose; the assertions, for that matter, were in regard only to the expenses in general, not to any specific meal or meeting. Mr. Marcus' testimony *61 did not amplify on the information in the diary. We can infer that many of the meals may have been with customers or potential customers, but the records contain no evidence whatsoever as to the purpose of the specific meetings. The diary is curiously lacking in any description of the specific business relationship (e.g., current customer, potential customer, co-worker) between Mr. Marcus and the person(s) entertained, and in some cases does not even identify the person(s) entertained. [45] In short, petitioners' vague assertions of the general business purpose for the 316 meals are insufficient to show that respondent's disallowance of 18 percent of the meal costs was improper. See Sanford v. Commissioner, supra.
*62 The diary also contained copies of checks and notations that Investment Club meetings were sponsored by petitioners on three weekends in 1977. Mr. Marcus testified that he was the broker for the club, and that the meetings were held to discuss the club's investments and to distribute monthly account statements to club members. Petitioners, however, have not offered testimony from any other club member, a club membership list, an account statement or any other evidence to support the existence of the investment club. Thus, we find that petitioners have not substantiated (1) the business purpose of the club, (2) whether the claimed expenses for the club meetings were ordinary and necessary, or (3) even whether an investment club existed. Similarly, petitioners failed to present a receipt for the tuxedo rented from Jack & Co. or the identity of the supposed business function for which the tuxedo was rented. In the diary are two charge slips -- one for a New York City hotel and the other for a restaurant -- to support Mr. Marcus' deduction for a Personal Growth Seminar. Petitioners, however, have offered no receipts for the cost of the seminar itself. They also failed to offer *63 any literature about the seminar so that we might determine whether the seminar expenses are properly deductible. Mr. Marcus had receipts for his California trip; however, his testimony regarding the California trip was vague -- only that the nature of the business was "to visit customers who lived in California and to solicit business and to establish relationships and enhance relationships that existed." Although only 20 percent of the cost of the trip was taken as a deduction, petitioners have not shown that any of the expenses are ordinary and necessary business expenses that were not primarily personal in nature. Last, respondent disallowed deductions for "gifts" of checks made out to "Cash" and cashed around the Christmas holiday period. In evidence are twenty-two such checks from Mr. Marcus' diary -- two in the amount of $ 300 and dated December 6, 1977, and twenty smaller checks, each in the amount of either $ 10 or $ 25 and dated December 19, 1977. [46]
Mr. *64 Marcus testified that he cashed the two $ 300 checks himself and gave cash tips to "runners and people like that." Mr. Marcus, however, provided no names of persons he tipped with this cash and did not testify as to the individual amounts given to any recipient. No other evidence was offered as to the amounts given to any individual. Thus, we cannot determine whether any individual was given a cash tip in excess of $ 25, the maximum deductible gift under section 274(b)(1). However, petitioners' failure to substantiate, as required by section 274(d), the tips represented by the two larger checks is a fortiori fatal to their claimed deductions. The record contains neither (i) any written statement or oral testimony of any recipient of any gift, nor (ii) any documentary evidence of either the amount of any individual cash tip or the name of any individual tipped. See sec. 1.274-5(c)(2)(i) and (3), Income Tax Regs. Thus, we hold that petitioners have not met their burden under section 274(d) to substantiate the cash tips. Rule 142(a). Mr. Marcus testified that the $ 10 and $ 25 checks were given to "margin clerks, order room clerks, people at Bear Stearns that had done things *65 for [Mr. Marcus] during the year." On the back of these smaller checks are endorsements by different people. We hold that Mr. Marcus' testimony, the discreet amount of each check, the date written on each check, and the endorsements on the back of the smaller checks by the sundry individuals are sufficient to substantiate the elements for which section 274(d) requires substantiation, namely, the description, amount, date, and business purpose of the gift, and the business relationship of the recipient to Mr. Marcus. We thus hold that petitioners have shown that they are entitled to a deduction of $ 350 for these twenty smaller checks. In summary, we hold that petitioners are entitled to an additional deduction for 1977 for gifts in the amount of $ 350, but we otherwise sustain respondent's determination of promotional expenses. [47]
To *66 reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. There is no evidence that petitioner Judith Marcus was associated with London options, so we often shall refer to Mr. Marcus separately in this part of our opinion. ↩
2. The use in our findings of such words and phrases as loss, gain, position, straddle, option, transaction, and similar words and phrases are for convenience only and are not to be construed as a determination of the nature of any act or thing. ↩
3. The parties' Second Stipulation of facts states that London options transactions resulted in claimed ordinary losses of $ 198,769.95 in 1977. That amount comports with the gains and losses reported on the 1977 tax return. That amount also comports with the notice of deficiency if total tin transactions are included as a loss, rather than a gain, of $ 10,732.90. It appears that the notice of deficiency inadvertently omitted parentheses that should be around the 1977 ordinary tin transactions to signify that the transaction were losses. We find that petitioners' return claimed and that the notice of deficiency disallowed total 1977 ordinary losses from London options in the amount of $ 198,769.95. ↩
4. The Second Stipulation of facts corrects an apparent error in the summation of 1977 capital transactions made in the First Stipulation of facts. The Second Stipulation comports with the 1977 tax return and the notice of deficiency. ↩
5. But see note 18, infra.↩
6. The strike price (or basis) of a commodity option is the price at which the underlying commodity would be bought or sold if the option were exercised. This term is to be distinguished from the price of the option itself, which is called the "premium." ↩
7. The evidence before us is not clear as to whether the options supposedly held in Mr. Marcus' account could be exercised at any time before the expiration date or only on the specific expiration date. See Glass v. Commissioner,87 T.C. 1087, 1098-1099↩ (1986), for a discussion of expiration (delivery) dates of options on the London Metals Exchange. 8. See generally Schapiro, "Commodities, Forwards, Puts and Calls -- Things Equal to the Same Things are Sometimes Not Equal to Each Other," 34 Tax Lawyer 581, 592-599 (1981). Accord, Glass v. Commissioner, supra↩ at 1098, as to options on the London Metals Exchange. 9. See infra↩ note 18 and accompanying text. 10. An option position may be closed out in any of three ways. One method is exercise of the option. If a put option is exercised, the seller (or grantor) of the option is then obligated to purchase the underlying commodity from the option holder at the strike price. A second method is simply to permit the option to expire unexercised and unsold, in which case it is said to "lapse." A third method is a closing sale or closing purchase transaction. In this case, the option holder purchases or sells an identical option which exactly offsets, and in effect liquidates, his original position.↩
11. See United States v. Turkish,623 F.2d 769 (2d Cir. 1980), cert. denied 449 U.S. 1077↩ (1981). 12. Except as otherwise stated, all section references (except to section 108, as amended, of the Deficit Reduction Act of 1984) are to sections of the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
13. In his opening statement petitioners' counsel conceded that the Notice of Deficiency raised the issues "whether or not the transactions were entered into for profit or were merely a sham for tax purposes * * *." ↩
14. That report also noted that coffee is traded on the New York Coffee and Sugar Exchange. Petitioners, however, do not mention that New York exchange and make no assertion or implication that the transactions at issue occurred on that exchange. Thus, we conclude that petitioners have conceded that none of the commodity transactions occurred on any United States exchange. ↩
15. Petitioners' brief alleges as a fact, "All of Marcus' transactions were conducted through Bear, Stearns, which, the Court may take judicial notices [sic], is a major New York sock [sic] brokerage." Such a fact, however, does not substantiate that the London options transactions were authentic, had economic substance, or were entered into with a profit motive. Shortly after Mr. Marcus' London options transactions supposedly occurred, Norman Turkish, Mr. Marcus' main contact at Bear Stearns in regard to London options, was convicted of conspiracy to fix and prearrange commodity future transactions. The transactions and cts for which Norman Turkish was convicted took place in 1975, several months before Mr. Marcus' transactions began. See DeMartino v. Commissioner,T.C. Memo. 1986-263. If we were to take judicial notice of Bear Stearns in regard to commodity transactions during the years at issue, we also would note the conviction of Norman Turkish, the manager of Bear Stearns' commodity department. If we took the requested judicial notice, we certainly would call into question the economic substance, as well as the authenticity, of any commodity transactions conducted through Norman Turkish's department at Bear Stearns. We also note that the form and content of petitioners' brief deviates significantly from that prescribed in Rule 151(e), paragraphs (1)-(3). ↩
16. The parties stipulated two LME "Standard Tin Contract Forms" -- one for a put option, the second for a call option. Each of those contracts apparently was executed in 1976 for Bear Stearns by Rayner, yet petitioners have not directed the Court to anything on either of those contracts that enables us to connect the contracts with any trade supposedly executed for or by Mr. Marcus. ↩
17. The Court defined a difference loss or gain as "the net difference exclusive of commission and other costs between loss and gain when all of the positions have been closed out." 87 T.C. at 1173↩. 18. The characterization by respondent's expert conforms with the strategy employed by the taxpayers in Glass. In Glass (87 T.C. at 1104-1106), a typical London options transaction consisted of both options and futures contracts. In its footnote 11, the Court in Glass specifically distinguished the strategy used by those taxpayers on the LME from a strategy which consisted of holding solely options. 87 T.C. at 1104. Petitioners have not attempted to show how, if at all, the strategy used in Mr. Marcus' account differed from that used by the LME investors in Glass.↩
19. See Schaprio, n.8 supra, 34 Tax Lawyer at 593↩. 20. We have two versions of Mr. Marcus' January 1977 statements. One shows an account net deficit of $ 373,073.44, the other a net deficit of $ 736,231.69. There was testimony that the monthly statements from Bear Stearns apparently were corrected and reissued from time to time, but none of the witnesses could conceive of an explanation to justify the repeated need for corrected statements. For that matter, no one has suggested which of the conflicting statements for January 1977 we should consider as correct. ↩
21. We acknowledge that the LME regulations would not require any margin call to be made on Mr. Marcus. Petitioners, however, have not advanced a satisfactory explanation for the lack of concern by Bear Stearns and Rayner over such a large deficit if the deficit truly was an economic loss. ↩
22. On the 1976 tax return the total of short term capital transactions in London options is incorrect. The sum of the individual transactions equals a loss of $ 9,887. The sum shown on the return, as well as the amount in the notice of deficiency, however, is $ (9,886). Thus, $ (9,886) is the amount at issue herein. ↩
23. See note 18, supra.↩
24. Section 108, after its 1986 amendment, currently provides: TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF THE ECONOMIC RECOVERY TAX ACT OF 1981. (a) General rule. -- For purposes of the Internal Revenue Code of 1954 in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,
any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. (b) Loss incurred in a trade or business. -- For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. (c) Net loss allowed. -- If any loss with respect to a position described in paragraphs (1) and (2) of subsection (1) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle. (d) Other rules. -- Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of whether there is recognized gain or loss with respect to a position and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle. (e) Straddle. -- For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day of 1981, and shall include a straddle all the positions of which are regulated futures contracts. (f) Commodities dealer. -- For purposes of this section, the term "commodities dealer" means any taxpayer who -- (1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), * * * (g) Regulated futures contracts. -- For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act). (h) Syndicates. -- For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1954) shall not be considered to be a loss incurred in a trade or business. 26 U.S.C.A. sec. 1092↩ note at 30-31 (West Supp. 1987). 25. Petitioners have neither argued nor offered any evidence to indicate that Mr. Marcus was a dealer in tin or coffee commodities for purposes of section 108. We view that as a concession by petitioners that the exception for commodity dealers in section 108(b) does not apply in the instant case, and that the general rule for investors is the appropriate standard to apply to Mr. Marcus. Rule 142(a). ↩
26. Mr. Marcus testified, "I was faced with sterling changes, strike price differentials, premium differentials, all kinds of differentials that I knew nothing about. I mean, I'm not saying I couldn't have known about them. I didn't study them. I took their word for it." ↩
27. Mr. Marcus testified that he "knew which direction coffee was going in the United States so I didn't really think it was going in any different direction over in London." No evidence or testimony was presented, however, as to what methods, if any, were available for Mr. Marcus to verify tin transactions. ↩
28. Petitioners' brief asserts that the fire occurred in May, 1976. The stipulation of facts, respondent's brief, and petitioners' testimony, however, state that the fire occurred in May, 1977, and we so find. ↩
29. Petitioners did not take a deduction for any damage to the house itself, and there is no issue before us in regard to damage to real property.↩
30. On cross examination of respondent's revenue agent, petitioners' counsel suggests that respondent's disallowance of all but $ 30,000 of the casualty loss deduction was arbitrary. Petitioners, however, have not suggested any authority mandating a change in the burden of proof simply because respondent's disallowance of a deduction may be arbitrary. For that matter, petitioners never suggest that arbitrariness on the part of respondent should shift either the burden of going forward or the ultimate burden of proof on the casualty loss issue to respondent. ↩
31. The parties' stipulation of facts erroneously sets forth the total claimed loss as $ 100,093; the losses and expenses listed on petitioners' 1977 return total only $ 100,092. ↩
32. Casualty loss of $ 30,000 over and above the $ 24,960 insurance reimbursements. ↩
33. See also Wroblewski v. Commissioner,T.C. Memo. 1973-37↩. 34. Cf. Stone v. Commissioner,T.C. Memo. 1972-211↩, where the Court found, inter alia, that the fair market value of the contents of the taxpayer's home was zero after a fire therein, and that the insurer paid the full amount of the policy without questioning the taxpayer's valuation. We are unable to make either of those findings in the instant case. 35. We also note that at least two addition errors are evident simply on the face of the inventory. The values given for items in the playroom closet sum to $ 458, yet the lead page of the inventory, which summarizes the totals of the items in the rooms of the house, shows the loss to items in the playroom closet as $ 485. Also, the sum of totals of the pages containing the inventory of the master bedroom are a few dollars less than the total for those pages as given on the summary page. ↩
36. Petitioners have not provided us with any documentation or other evidence, such as pictures of the damaged rooms, whereby we might conclude that the fire totally destroyed all the contents in the house, rather than partly damaged only some of the items. This lack of substantiating evidence is particularly significant, given petitioners' burden to prove their assertion that the household possessions were destroyed totally. ↩
37. There is no testimony as to why the insurer only reimbursed petitioners for one quarter of their claimed loss, nor does either of petitioners' briefs even mention this obvious incongruity. ↩
38. Petitioners' reliance on the receipts in the folder reminds us of the "shoebox method" we discussed in Patterson v. Commissioner,T.C. Memo. 1979-362↩. 39. We do not mean to imply that petitioners would be allowed a fire loss deduction only for items for which they had receipts and records. As we noted in Pfalzgraff v. Commissioner,67 T.C. 784, 792 (1977), "No one keeps double ledger accounts on socks, shoes, underwear, or the many other small purchases that comprise the personal property of a household. Even if they had such records, they would often be destroyed in the fire. Additionally, * * * there are no blue book values for a burned bonnet, [and] willing buyers and sellers of a charred couch are nowhere to be found." The Court in Pfalzgraff↩ was able to make a reasonable determination of the damage from the fire, however, because before it were testimony and opinions from two experts from fire insurance companies. Testimony from such experts is much more probative as to the diminution in value caused by a fire than is the unsubstantiated, lay testimony of interested parties, like petitioners herein. 40. Petitioners' briefs offer little or no authority in regard to any part of the fire loss issue. They offer virtually no case law precedent for any assertions they make. ↩
41. In 1976 and 1977, section 274 provided as follows: SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation. -- (1) In general. -- No deduction otherwise allowable under this chapter shall be allowed for any item -- (A) Activity. -- With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, * * * and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business. * * * (b) Gifts. -- (1) Limitation. -- No deduction shall be allowed under section 162 or section 212 for any expense for gifts made directly or indirectly to any individual to the extent that such expense, when added to prior expenses of the taxpayer for gifts made to such individual during the same taxable year, exceeds $ 25. * * * (d) Substantiation Required. -- No deduction shall be allowed -- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of travel, entertainment, amusement, recreation or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. (e) Specific Exceptions to Application of Subsection (a). -- Subsection (a) shall not apply to -- (1) Business meals. -- Expenses for food and beverages furnished to any individual under circumstances which (taking into account the surroundings in which furnished, the taxpayer's trade, business, or income-producing activity and the relationship to such trade, business, or activity of the persons to whom the food and beverages are furnished) are of a type generally considered to be conducive to a business discussion. ↩
42. On a few entries, there was a notation for "snack" rather than for dinner or lunch, but these entries also usually showed entertainment (such as movies) or significant dollar amounts for "drinks." ↩
43. 40 of the days for which deductible meals were taken were Saturdays or Sundays. In fact, Mr. Marcus claimed deductible meals for 15 of the first 19 weekends in 1977, and took deductions for Investment Club meeting expenses for two of the other four weekends. Fewer weekend meals were claimed by Mr. Marcus after the May house fire. Respondent's brief contends that the large number of meals claimed on weekends indicates that these meals were personal, rather than business, in nature. We, however, need not address respondent's contention because of our findings below. ↩
44. Respondent allowed the majority of petitioners' claimed promotional expenses, and we take that as a concession by respondent that an employee, like Mr. Marcus, may take deductions for business expenses because they are related to the employee's trade or business of being an employee. ↩
45. As an example, we note one recurring entry in the diary upon which petitioners have not commented: "Dinner -- worked late (C.S.)". No authority has been suggested to us that would allow Mr. Marcus a deduction for dinner when he worked late. ↩
46. The twenty smaller checks total $ 350 which, combined with the two large checks, amount to a total of $ 950. The difference between this amount and the $ 935 disallowed by respondent is not explained. ↩
47. During Mr. Marcus' testimony, he asserted that respondent had not allowed him a deduction for sales tax on the promotional expenses disallowed by respondent. Petitioners have not shown what amounts of sales tax were paid on the disallowed expenses, so we cannot say that they are entitled to an additional deduction for sales taxes. ↩