ERWIN STARR AND HELEN STARR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Starr v. Commissioner
Docket No. 39314-84
United States Tax Court
T.C. Memo 1991-610; 1991 Tax Ct. Memo LEXIS 657; 62 T.C.M. (CCH) 1417; T.C.M. (RIA) 91610; December 10, 1991, Filed *657 Petitioner Erwin Starr, a retired businessman and an active investor, engaged in six series of futures straddles during 1978-80. Those straddles gave rise to short-term and long-term capital losses and gains, which were reported on petitioners' 1978, 1979, and 1980 tax returns. Respondent disallowed those gains and losses. Held: Petitioners have failed to meet their burden of proof in showing that petitioner Erwin Starr entered into the straddles at issue primarily for profit within the meaning of sec. 108(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630-631, as amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1808(d), 100 Stat. 2085, 2817-2818. Held further: The losses arising from those straddles are not allowed under sec. 108(a). Held further: Petitioners are liable for an increased rate of interest pursuant to sec. 6621(c) (formerly sec. 6621(d)) due to a substantial underpayment attributable to one or more tax-motivated transactions. Richard J. Alan Cahan and Joshua N. Bennett, for the petitioners. W. Robert Abramitis and John F. Hernandez, for the respondent. HALPERN, Judge. HALPERN
MEMORANDUM OPINION
*658 By notice of deficiency dated September 7, 1984, respondent determined deficiencies in petitioners' Federal income tax as follows: Tax Year Ending
Deficiency
December 31, 1978
$ 61,548
December 31, 1979
38,539
December 31, 1980
67,936
By amendment to his answer, respondent also determined that petitioners are liable for an increased rate of interest pursuant to section 6621(c)[1] (formerly section 6621(d)) due to a substantial underpayment attributable to one or more tax-motivated transactions. While respondent's notice of deficiency raised other issues, the only issues remaining for our decision are, one, whether petitioner Erwin Starr entered into certain futures transactions primarily for profit, permitting him to claim certain capital losses from those futures, and, two, whether *659 the increased interest rate provided by section 6621(c) applies. Background
Petitioners are respectively husband and wife. At the time the petition in this case was filed, petitioners resided in Key Biscayne, Florida. When used in the singular, the term "petitioner" refers to petitioner Erwin Starr. Some of the facts have been stipulated and are found accordingly. By this reference, the stipulation of facts filed by the parties and attached exhibits are incorporated herein. Petitioner, a retired businessman, is an active investor. During the tax years at issue, his investment activities constituted his sole source of income. He spent as much as 6 hours a day on those activities, consulting with people concerning his investments and reading investment materials. Much of his investing was on a short-term basis and involved trading various corporate and Government securities. In addition to other investments, petitioner traded commodity futures for roughly 10 years ending early in the 1980's. For the tax years at issue, petitioner used Bear, Stearns & Co. in New York City for trading futures, and his primary broker at Bear Stearns was Arthur Lashinsky. His Bear Stearns *660 account did not permit Mr. Lashinsky or any other person at Bear Stearns to enter and execute trades on petitioner's behalf without his permission. Petitioner's trades took place during normal commodity exchange hours and were not after-hours trades. For the years at issue, neither one of petitioners nor any of their ancestors, lineal descendants, or trusts in which they were the primary beneficiaries was registered with a domestic board of trade designated by the Commodities Futures Trading Commission as a contract market. During 1978 through 1982, petitioner traded commodity futures involving soybeans, copper, gold, silver, and Ginnie Mae Certificates and specifically traded the futures detailed in appendix A, comprising six series of commodity straddles. At trial, we found that trades in those futures did indeed occur, as petitioners claim. We note that, while petitioner entered all the futures transactions listed in appendix A during 1978, 1979, and 1980, petitioner closed four of those futures during 1981 and 1982 (years not here at issue). The terms "commodity futures," "straddles," "short" and "long" positions, and certain other terms used in this opinion are terms of *661 art employed in trading futures. In appendix B, we set forth definitions of such terms and briefly discuss the economic rationale for trading futures. For each series of straddles in appendix A, petitioner opened with a short and a long position in the same commodity. Each position, or leg, was for a different delivery month. After a period of time, petitioner proceeded to switch one leg of the straddle with an identical leg except with a different delivery month. With three of the six series at issue, petitioner engaged in a second switch before closing out both legs in the final transactions. With the other three, petitioner closed out the two legs after only one switch. The net results of petitioner's futures trading described in appendix A are as follows: Net
Net
Net
Net
Short-Term
Short-Term
Long-Term
Long-Term
Capital Gain
Capital Loss
Capital Gain
Capital Loss
Net
1978
$ 2,435
$ 142,633
($ 140,198)
1979
$ 132,736
$ 270,139
$ 137,403
1980
$ 129,611
($ 129,611)
1981
$ 103,881
$ 51,339
$ 52,542
1982
$ 133,129
$ 61,871
$ 71,258
($ 8,606)
The economic consequences to petitioner go beyond his net loss of $ 8,606. Petitioner had *662 other gains and losses from securities transactions (mostly short-term gains) during the years in question, and the tax losses claimed by petitioners from futures trading served both to defer taxation of such other gains and, to some degree, to convert short-term gains to preferably taxed long-term gains. In his testimony at trial, petitioner was unable to shed much light on his motivation in entering into these futures. Petitioner's testimony was straightforward and credible; nevertheless, it was unenlightening. When asked to explain his motivation for entering into any one of the futures in question, petitioner responded that he could not remember. In responding to the Court's questions concerning generally the factors that would have been taken into account in any particular trade, petitioner responded: "Judge, I would be -- I just really -- I cannot remember why I -- why these were done. I just can't remember them." Petitioner did not recall whether he reviewed historical price data for particular commodities and was very vague about his strategies for particular trades and his overall trading philosophy. Although petitioner did understand a few terms of art related to commodity *663 futures, petitioner was unsure on which market the relevant commodities were traded and failed to recall the unit sizes in which the commodities were traded. Petitioner's recollections of the basic tax effects of straddle trading were strong. In addition, while petitioner testified that he discussed his futures trading with his broker, Arthur Lashinsky, and that he read various materials on the potential hazards of such trading, Lashinsky did not testify concerning the content of the discussions, and those materials were not included in the record. Further, petitioner used several accountants during the period in which he traded futures, none of whom testified. At trial, petitioners attempted to avail themselves of an expert witness who would testify as to petitioner's motivation. That witness, however, was not accepted by the Court as an expert in futures trading and was not allowed to testify as to petitioner's motivation. After petitioners conceded that respondent's expert witness was qualified, respondent's expert witness testified that, absent some theory based on the occurrence of a cataclysmic event, petitioner's trading pattern of taking losses in the current year and *664 carrying the position with unrealized gain into the long-term holding period in the next year was inconsistent with a profit-motivated strategy. In his notice of deficiency, respondent refused to recognize certain capital losses and gains from petitioner's futures transactions that petitioners claimed on their 1978, 1979, and 1980 tax returns. Those certain losses and gains are: Tax Year
Short-/Long-Term
Commodity Futures
Gain/(Loss)
1978
Short-Term
Silver
Dec
1979
($ 61,095)
Gold
June
1979
(31,148)
Gold
June
1979
(14,465)
Soybeans
May
1979
(30,597)
Copper
July
1979
(5,328)
Copper
Sept
1979
2,435
1979
Short-Term
Soybeans
Aug
1979
(35,847)
Gold
April
1979
(31,603)
Silver
March
1980
(48,195)
Copper
Jan
1980
(17,091)
Loss Carryover
(6,916)
Long-Term
Soybeans
July
1979
66,178
Gold
Aug
1979
79,497
Silver
Jan
1980
[2] 101,829
Copper
Dec
1979
17,559
1980
Short-Term
Gold
April
1982
[2] (41,094)
Gold
Oct
1981
(17,229)
GNMA
March
1982
(34,346)
GNMA
Sept
1982
(25,703)
GNMA
Dec
1982
(10,234)
*665 In response to respondent's notice of deficiency, petitioners timely filed the petition in this case. In a memorandum opinion filed in March 1990, this Court denied petitioners' motion for summary judgment on the issue of petitioner's futures transactions. Starr v. Commissioner, T.C. Memo 1990-146. In November 1990, respondent filed a motion to allow the filing of an amendment to respondent's answer, which motion we granted. Respondent's first amendment to answer was then filed. In that amendment, respondent seeks a determination that petitioners are liable for increased interest pursuant to section 6621(c), for the tax years at issue. A trial was held in April of this year. In sum, the issues for decision are, one, whether petitioner Erwin Starr entered into certain futures transactions primarily for profit, permitting him to claim certain capital losses from those futures, and, two, whether the increased interest rate provided by section 6621(c) applies. Discussion
We consider here the tax consequences of gains and losses arising from six series of straddles in commodity futures. As a preliminary matter, we note that Congress dealt extensively *666 with the tax consequences of straddle transactions in the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, secs. 501-509, 95 Stat. 172, 323-335. ERTA created a new set of rules that were designed to tax straddle transactions on their economic substance. See S. Rept. 97-144, at 147 (1981), 1981-2 C.B. 412, 470. The ERTA rules in question do not effect the transactions here at issue, as they in general apply only to "property acquired and positions established by the taxpayer after June 23, 1981, in taxable years ending after such date." ERTA sec. 508, 95 Stat. 333. Respondent's Arguments
In his notice of deficiency, respondent makes several arguments. First, he asserts that the gains and losses claimed by petitioners should be not be recognized, because petitioners have not established that the transactions actually occurred. That argument is no longer relevant, because, at trial, we found as a fact that the transactions did occur. Second, respondent asserts that each of the transactions was but one step in a series of transactions that must be integrated for tax purposes and which constitute but a single transaction. We have rejected that argument *667 in the past and reject it again here. See Smith v. Commissioner, 78 T.C. 350, 385-390 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). Third, respondent asserts that "such transactions do not represent a sufficient change in economic position to justify recognition for tax purposes of the losses or gains as claimed." We reject that argument, as we do not believe that the facts here support it. See Glass v. Commissioner, 87 T.C. 1087 (1986), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Bohrer v. Commissioner, 945 F.2d 344 (10th Cir. 1991). Finally, respondent argues that the losses at issue were not incurred in transactions entered into for profit and that, consequently, such losses are not deductible. [3] We consider below that last argument.
*668 Section 108
Section 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630-631, as amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1808(d), 100 Stat. 2085, 2817-2818, allows certain losses from straddles that are not covered by ERTA. Further references to section 108 will be to section 108 of the Deficit Reduction Act of 1984 as amended in 1986. Section 108 governs here in that it covers pre-ERTA straddles of the type involved in this case. Section 108(a) states: (a) GENERAL RULE. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,
any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.
In Glass v. Commissioner, 87 T.C. at 1167, we discussed the effect of section 108: In summary, *669 then, amended section 108 traces the pattern of the loss provisions of section 165(c)(1) and (2), and makes it clear that losses incurred by commodities dealers trading in commodities are deductible under section 108 since they are losses incurred in a trade or business. Investors, on the other hand, must meet the test of loss incurred in a transaction entered into for profit. In the context of commodity straddle transactions, the investor language parallels the section 165(c)(2) language which we construed in Smith and Fox [v. Commissioner, 82 T.C. 1001 (1984)], and (except as to commodities dealers) we think the effect of amended section 108 is to revalidate our holdings in those cases. * * *
Petitioners do not argue that the futures at issue were not part of straddles within the meaning of section 108 and have failed to raise timely the issue whether the disallowed losses were incurred in a trade or business. Our inquiry, therefore, narrows to whether, under section 108, petitioner's losses from straddles in the commodity futures at issue were incurred in transactions entered into for profit, though not connected with a trade or business. We have *670 found that the profit-motive test of section 108 was intended to be similar to the test found in section 165(c)(2). Boswell v. Commissioner, 91 T.C. 151, 158-159 (1988) (Court reviewed). In Boswell, we found that test to be whether the taxpayer entered the relevant transactions primarily for profit. See Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). We previously have summarized the guidelines for that test as found in Fox v. Commissioner, supra, and Smith v. Commissioner, supra: (1) The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive. (2) Profit motive refers to economic profit independent of tax savings. (3) The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss. (4) If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially *671 factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent. (5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent.
Ewing v. Commissioner, 91 T.C. 396, 418 (1988), affd. without published opinion 940 F.2d 1536 (9th Cir. 1991) (citations omitted). Normally, a taxpayer would have to prove not only that he had a profit motive in entering the relevant transactions, but that such profit motive was primary. However, as in Ewing v. Commissioner, 91 T.C. at 418, and Fox v. Commissioner, 82 T.C. at 1021-1022, we proceed here on the supposition without so finding that petitioner had a sincere belief that there was a possibility of making some profit from his transactions and was attracted to the transactions by that belief as well as by the favorable tax benefits. We must determine, though, whether the profit or the tax-benefit motive was primary, or of first importance. The *672 determination is one of fact on which petitioners bear the burden of proof. Ewing v. Commissioner, 91 T.C. at 418; Rule 142(a). Petitioner's Primary Motive
We hold that petitioners have failed to meet their burden of proof in showing that petitioner entered into the futures transactions at issue primarily for profit. First, petitioner's trading pattern generally followed the pattern of an investor interested in commodity straddles for tax reasons. Although petitioners' tax returns do show that, during the tax years before us, petitioner engaged in other futures transactions that are not at issue here, the transactions before us represent the majority of petitioner's futures transactions during those years, in terms of both number and size of losses and gains. [4] These facts and circumstances distinguish this case from our decisions in Stoller v. Commissioner, T.C. Memo 1990-659, and Etshokin v. Commissioner, T.C. Memo 1990-271, which petitioners cite in support of their argument that petitioner had a primary profit motive. We believe that the commodity futures at issue accurately reflect petitioner's overall trading *673 pattern and, thus, reveal his tax motive.
In a typical tax straddle, the taxpayer attempts to postpone the taxability of short-term capital gains by moving them into future years (deferral) and possibly converting them to longterm capital gains (conversion), all with the minimum economic risk associated with straddles. In Smith v. Commissioner, 78 T.C. at 363-366, we described in detail the pattern of a trader interested in straddles primarily for tax reasons and will not repeat that description here. See Ewing v. Commissioner, 91 T.C. at 400-401. Petitioner's trading pattern reflected the pattern of a typical tax-motivated *674 trader. Almost all the disallowed gains and losses reflect the ideal results for a taxpayer with a tax motive. See Ewing v. Commissioner, 91 T.C. at 419. The disallowed losses are all short-term losses, and the disallowed gains are mostly long-term capital gains. Further, the straddle legs giving rise to the long-term capital gains claimed by petitioners for the years at issue generally were held only a few days beyond the period necessary to achieve long-term status. A fundamental legal maxim, of course, provides that the consequences of one's acts are presumed to be intended. See Fox v. Commissioner, 82 T.C. at 1022. Second, although actual profits are not a prerequisite to the deductibility of losses, a record of continued losses over a period of time may be an important factor bearing on the taxpayer's true intentions. Fox v. Commissioner, 82 T.C. at 1023 (citing Bessenyey v. Commissioner, 45 T.C. 261, 273-274 (1965), affd. 379 F.2d 252 (2d Cir. 1967)). Petitioner was an active and experienced investor who spent an extensive amount of time handling his investments. Despite *675 that time and experience, however, petitioner's results from the six series of straddles listed in appendix A show that, on a net basis, petitioner lost money from those straddles. While petitioner's net loss from the series of straddles was less than $ 9,000, and while his largest loss from an individual series of straddles was less than $ 7,000, petitioner used in 1978 and 1980 over $ 250,000 in net capital losses from his futures trading to offset other capital gains. Further, petitioner's losses from those straddles contrast with his success in stock and arbitrage investments as reflected in the extensive capital gains claimed by petitioners for 1978, 1979, and 1980. Third, petitioners presented no evidence that the commodity straddles at issue had the objective potential to earn an economic profit. At trial, we disqualified petitioners' expert witness from testifying regarding the objective profit potential of those straddles, because we found that the witness had insignificant experience and knowledge. In contrast, at trial, respondent's expert witness testified that, absent some theory based on the occurrence of a cataclysmic event, petitioner's trading pattern was inconsistent *676 with any profit-motivated strategy. Fourth, although petitioner testified that he had a primary profit motive, his testimony was not corroborated by the testimony of others, and he presented no contemporaneous evidence of his subjective intent. Petitioner presented none of the materials on futures trading that he testified to have read, and Arthur Lashinsky, petitioner's broker at Bear Stearns, did not testify concerning the content of his discussions with petitioner. Testimony from Lashinsky might have revealed whether or not, and the extent to which, petitioner discussed with him the tax consequences or the profit potential of his futures trading. Also, petitioner apparently used several accountants during the period in which he traded commodity futures, but none of them testified. Testimony from his accountants, of course, might have revealed the extent of petitioner's interest, or lack of interest, in the tax consequences of futures. In sum, we cannot assume that the testimony of absent witnesses would have been favorable to the party with the burden of proof; indeed, the normal inference is that the testimony would be unfavorable. Marcus v. Commissioner, T.C. Memo 1988-3. *677 Finally, we have nothing here evidencing petitioner's motivation other than petitioner's own uncorroborated testimony, which testimony we find to be of little or no probative value. See Smith v. Commissioner, 78 T.C. at 394; Marcus v. Commissioner, supra.Although petitioner's motivation in entering into these futures transactions is the key issue in this case, petitioner was unable, at trial, to shed much light on that motivation. While petitioner's testimony revealed that petitioner understood a few terms of art related to commodity futures, petitioner failed to recall many details of his futures trading and was very vague about his strategies for particular trades and his overall trading philosophy. Compare Stoller v. Commissioner, T.C. Memo 1990-659. His recall of the basic tax effects of straddle trading, however, was good. We, of course, are aware that tax planning is an economic reality in the business world and the effect of tax laws is routinely considered along with other factors. The question here concerns petitioner's primary motive in entering the commodity straddles at issue. Petitioners bear the *678 burden of proof. Rule 142(a). We find that petitioner has failed to show that he had the requisite profit motive. Therefore, we uphold respondent's determinations regarding the short-term capital losses disallowed by respondent. We, however, note that section 108(c) applies to the futures transactions detailed in appendix A. [5] See sec. 1.165-13T, Q-3 & A-3, Temporary Income Tax Regs., 49 Fed. Reg. 33445 (Aug. 23, 1984). ("Under section 108(c) of the Act the taxpayer is allowed to offset the gain in the subsequent taxable year by the amount of loss (including expenses) disallowed in year 1."). The parties should take section 108(c) into account in making the computations required by Rule 155. *679 Increased Rate of Interest
In an amended answer, respondent seeks increased interest pursuant to section 6621(c) (formerly 6621(d)). Respondent has the burden of proof with respect to the increased interest. Ewing v. Commissioner, 91 T.C. at 422; Rule 142(a). The increased interest provided by section 6621(c) applies to any substantial underpayment of income taxes attributable to one or more tax-motivated transactions. This increased interest accrues after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Ewing v. Commissioner, 91 T.C. at 422. Section 6621(c)(3)(A)(iii) defines the term "tax-motivated transaction" to include any straddle. See sec. 301.6621-2T, Q & A-2, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). Consequently, any underpayment of income taxes by petitioners derived from the claimed straddle losses is attributable to a tax-motivated transaction and subject to section 6621(c). Sec. 6621(c)(3)(A)(iii); Ewing v. Commissioner, 91 T.C. at 422. Decision will be entered under Rule 155. *680 APPENDIX A
ERWIN STARR -- TRANSACTIONS IN COMMODITY FUTURES
LINE
TRADE
POSITION
DELIVERY
COMMODITY
CONTRACTS
DATE
DATE
(QUANTITY)
1
7/20/78
short
July
1979
copper
9
2
7/20/78
long
Dec
1979
(25,000 lbs
9
per contract)
3
8/21/78
long
July
1979
9
4
8/21/78
short
Sept
1979
9
5
9/6/78
long
Sept
1979
9
6
9/6/78
short
Jan
1980
9
7
1/23/79
long
Jan
1980
9
8
1/23/79
short
Dec
1979
9
1
7/20/78
short
Dec
1979
silver
30
2
7/20/78
long
Jan
1980
(5,000 ounces
30
per contract)
3
8/1/78
long
Dec
1979
30
4
8/1/78
short
March
1980
30
5
1/23/79
short
Jan
1980
30
6
1/23/79
long
March
1980
30
1
7/20/78
short
June
1979
gold
22
2
7/20/78
long
Aug
1979
(100 ounces
22
per contract)
3
8/1/78
short
April
1979
22
4
8/1/78
long
June
1979
15
5
8/1/78
long
June
1979
7
6
1/23/79
long
April
1979
22
7
1/23/79
short
Aug
1979
22
1
7/21/78
short
May
1979
soybeans
70,000 bu
2
7/21/78
long
July
1979
70,000
3
8/24/78
long
May
1979
70,000
4
8/24/78
short
Aug
1979
70,000
5
1/23/79
short
July
1979
70,000
6
1/23/79
long
Aug
1979
70,000
1
11/26/80
short
Dec
1981
gold
6
2
11/26/80
long
April
1982
(100 ounces
6
per contract)
3
12/10/80
long
Oct
1981
6
4
12/10/80
short
April
1982
6
5
12/12/80
short
Oct
1981
6
6
12/12/80
long
Feb
1982
6
7
2/6/81
long
Dec
1981
6
8
2/6/81
short
Feb
1982
6
1
11/26/80
long
March
1982
Ginnie Mae
15
2
11/26/80
short
Sept
1982
Certificates
15
(Face Ammount)
3
12/12/80
short
March
1982
of $ 100,000)
15
4
12/12/80
long
June
1982
15
5
12/19/80
long
Sept
1982
15
6
12/19/80
short
Dec
1982
15
7
12/23/80
short
Sept
1982
15
8
12/23/80
long
Dec
1982
15
9
5/26/82
short
June
1982
15
10
5/26/82
long
Sept
1982
15
*681 LINE
TRADE
RATE
PRICE
COMMISSION
GAIN/LOSS
CLOSES
DATE
(LINE)
1
7/20/78
$ .6675/lb
$ 150,187.50
2
7/20/78
.6920
155,700.00
3
8/21/78
.6910
155,475.00
$ 40.50
($ 5,328)
1
4
8/21/78
.6980
157,050.00
5
9/6/78
.6870
154,575.00
40.50
2,435
4
6
9/6/78
.7000
157,500.00
7
1/23/79
.7745
174,262.50
328.50
(17,091)
6
8
1/23/79
.7715
173,587.50
328.50
17,559
2
NET
($ 2,425)
1
7/20/78
$ 5.9850/oz
$ 897,750
2
7/20/78
6.0300
904,500
3
8/1/78
6.3850
957,750
$ 1,095
($ 61,095)
1
4
8/1/78
6.5250
978,750
5
1/23/79
6.7500
1,012,500
1,095
106,905
2
6
1/23/79
6.8390
1,025,850
1,095
(48,195)
4
NET
($ 2,385)
1
7/20/78
$ 204.10/oz
$ 449,020
2
7/20/78
207.40
456,280
3
8/1/78
221.00
486,200
4
8/1/78
224.50
336,750
$ 547.50
($ 31,148)
1
5
8/1/78
224.40
157,080
255.50
(14,465)
1
6
1/23/79
235.00
517,000
803
(31,603)
3
7
1/23/79
243.90
536,580
803
79,497
2
NET
$ 2,281
1
7/21/78
$ 6.28/bu
$ 439,600
2
7/21/78
6.29 3/4
440,825
3
8/24/78
6.71
469,700
$ 497
($ 30,597)
1
4
8/24/78
6.69
468,300
5
1/23/79
7.25
507,500
497
66,178
2
6
1/23/79
7.195
503,650
497
(35,847)
4
NET
($ 266)
1
11/26/80
$ 736.40/oz
$ 441,840
2
11/26/80
775
465,000
3
12/10/80
655.40
393,240
4
12/10/80
705.10
423,060
$ 159
($ 42,099)
2
5
12/12/80
627.50
376,500
489
(17,229)
3
6
12/12/80
661
396,600
7
2/6/81
563
337,800
159
103,881
1
8
2/6/81
575.70
345,420
159
(51,339)
6
NET
($ 6,786)
1
11/26/80
69 10/32
$ 1,039,687.50
2
11/26/80
69 11/32
1,040,156.25
3
12/12/80
67 3/32
1,006,406.25
$ 1,064.95
($ 34,346)
1
4
12/12/80
67 8/32
1,008,750.00
5
12/19/80
71 1/32
1,065,468.75
390
(25,703)
2
6
12/19/80
70 30/32
1,064,062.50
7
12/23/80
71 22/32
1,075,312.50
8
12/23/80
71 19/32
1,073,906.25
390.05
(10,234)
6
9
5/26/82
63 5/32
947,343.75
464.95
(61,871)
4
10
5/26/82
62 25/32
941,718.75
465.05
133,129
7
NET
$ 975
NET GAIN/(LOSS) FROM TRANSACTIONS IN COMMODITY FUTURES
NET
($ 8,606)
*682 Explanation of Columns: Trade Date = date position established Position = position established, long or short Gain/Loss = gain or loss when position closed, including any commissions Closes (Line) = line of old position which new position closes APPENDIX B
We describe below some terms of art used in trading futures. See Ewing v. Commissioner, 91 T.C. 396, 399-402 (1988), affd. without published opinion 940 F.2d 1536 (9th Cir. 1991); Smith v. Commissioner, 78 T.C. 350, 354-356 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). A commodity futures contract is a firm commitment to deliver or receive a specified quantity of a commodity during a designated future month at a designated price. Each such contract is called a "position." A position is "long" if the contract requires the holder to purchase the designated commodity. A position is "short" if a contract requires the holder to sell a designated commodity. When only one position is held, the holder is described as holding an "open position." A futures contract may be offset or closed out by taking the opposite position *683 in the same commodity for the same month. A "straddle" involves simultaneously holding a long position in a commodity for one delivery month and a short position in the same commodity for a different delivery month. Each position in a straddle is known as a "leg," and the difference between the market value of each leg is called the "spread." In a straddle, the holder is concerned primarily with the spread. A "switch" occurs when one leg of a straddle is closed out and is replaced by an identical leg except with a different delivery month, resulting in a new straddle. The economic profit or loss of an open position is directly affected by changes in the direction of the market. In contrast, the economic profit or loss of a straddle is affected only by whether the spread widens or narrows. Acquiring a commodity straddle carries less risk than acquiring an open position, because the spread will be less volatile than the price of either leg. With a straddle, the holder is both a purchaser and seller of the same commodity. Since each leg of a straddle requires delivery of the commodity during different months, any price changes in the two legs will be related, but not always identical. *684 The price of each leg of a straddle will be affected by similar economic conditions, and the loss on one leg generally will be offset largely by the gain on the other leg. If the spread widens or narrows, a gain or loss will be incurred. In turn, if the spread remains constant, no gain or loss would be incurred, because any price changes produces an unrealized gain in one leg and an offsetting unrealized loss in the other leg. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. There appears to be an inconsistency between (a) these capital losses and gains as reflected on petitioners' tax returns and respondent's notice of deficiency and (b) the losses and gains that are reflected in Joint Exhibit 5-E and Appendix A to this opinion. Any such inconsistency can be resolved in the computations required under Rule 155.↩
3. Respondent also asserts in the notice of deficiency that, if the transactions were entered into for profit, the claimed losses should be limited to the amount at risk. We do not need to consider that argument and refer respondent to Laureys v. Commissioner, 92 T.C. 101, 129-132↩ (1989).
4. For example, on their 1978 tax return, petitioners claimed gains and losses related to four corn futures, none of which was over $ 1,100. For 1979, petitioners claimed gains and losses related to six other copper and gold futures, none of which was over $ 10,000. For 1980, respondent disallowed all claimed gains and losses arising from commodity futures.↩
5. Sec. 108(c) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, provides that: If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.↩