# United States Tax Court

T.C. Memo. 2022-122

KENNETH M. BROOKS AND ANITA WOLKE BROOKS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 28206-15.                           Filed December 19, 2022.

———————

*Matthew Jay Howard* and *Kenneth D. Hall*, for petitioners.

*Shannon E. Craft*, *John T. Arthur*, and *Christopher D. Bradley*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, *Judge*: Respondent issued a notice of deficiency to petitioners, Kenneth M. Brooks and Anita Wolke Brooks, in which he disallowed carryover charitable contribution deductions relating to petitioners' interest in the Kenneth Brooks and Anita Wolke Brooks Family, LLC's noncash charitable contribution of a conservation easement. The questions presented are whether petitioners are (1) entitled to deduct carryover charitable contributions of $657,135 $763,835, and $743,862 and (2) liable for accuracy-related penalties pursuant to section 6662(h),[1] for the 2010, 2011, and 2012 tax years, respectively.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*2]                          FINDINGS OF FACT

The parties filed a Stipulation of Facts, which is hereby incorporated by reference into our findings. When the Petition was filed, petitioners resided in Virginia. On December 15, 2006, the Kenneth Brooks & Anita Wolke Brooks Family, LLC[2] (LLC), which is co-owned by petitioners, purchased 85.314 acres of real property known as Cotton Row Farm in Liberty County, Georgia, for $1,350,000. On the same day, the LLC subdivided the property into two parcels of 44.113 and 41.201 acres.

A.      *Easement Deed and Attachments*

The LLC granted and recorded a conservation easement over the 41.201-acre parcel (encumbered parcel) on December 27, 2007, to Liberty County, Georgia, a political subdivision of the State of Georgia and a qualified organization pursuant to section 170(h)(3).

The deed granting the easement (Easement Deed) provides that

> Grantor, for and in consideration of the sum of ten dollars ($10.00) and other good and valuable consideration and in consideration of the covenants, mutual agreements, conditions and promises herein contained, does hereby grant unto the Grantee, its successors and assigns, forever a conservation easement as defined in O.C.G.A. §§ 44-10-1 et seq. in perpetuity, over the Protected Property of the nature and character and to the extent herein set forth.

The Easement Deed does not otherwise refer to any consideration paid by Liberty County to petitioners or their LLC (the grantor).

The restrictions placed on the use of the encumbered parcel include, among others, that the donor shall not "construct buildings, means of access, or other structures on the Conserved Property"; "excavate, dredge, mine, or remove loam, gravel, soil, rock, sand, coal, petroleum or other materials from the Conserved Property"; "dike, drain, fill, dredge, or otherwise remove the wetlands on the Conserved Property"; "harvest the Conserved Property"; "display billboards, signs or advertisements on or over the Conserved Property"; or "dump or place soil, trash, garbage, waste, vehicles, appliances, machinery or other materials on the Conserved Property." However, the LLC reserved

---

[2] The LLC is not subject to the TEFRA provisions. *See* § 6231(a)(1)(B)(i).

[*3] enumerated rights (1) to construct and use, with certain restrictions, two paddocks, a barn with up lighting and down lighting on its one-acre parcel, rail fencing, underground and overhead utilities, and five acres for agricultural activity; (2) to cut, burn, or remove certain plants and trees to protect or restore the natural state of the encumbered parcel; (3) to harvest timber to construct the paddocks; (4) to plant indigenous trees and shrubs; (5) to make certain modifications to encourage growth of certain native animal and insect species; (6) to maintain or replace existing road beds, paths and all other land features and structures; and (7) to use the encumbered parcel for personal enjoyment not adverse to the conservation values. Notice must be provided to Liberty County before exercising any of the reserved rights.

The terms of the Easement Deed include, in relevant parts, that the terms and conditions are "set forth herein"; that the grantor agreed to "convey and donate" the easement "as set forth herein"; and that the covenants, mutual agreements, conditions and promises were "herein contained." The Easement Deed does not state whether it constitutes the entire agreement between the parties.

Attached to the deed and identified as Exhibit A is a document titled "Boundary Description and Protected Property Reference." The first page includes a half-page description of the property's location, one map showing the outside boundaries of the 41.201-acre parcel subject to the easement, and a second map adding only that the parcel is bisected by an unidentified element.

Attached to the deed and identified as "Exhibit B: Baseline Survey Summary" is a document titled "Conservation Easement Baseline Documentation Report" (Baseline Report). The report was prepared by Frank McIntosh, a biologist employed at the time by Georgia Land Trust, Inc. The report consists of five pages. The cover sheet provides basic information such as names and dates. The second page is the "Abstract," which identifies the property owner, size, and location, as well as providing directions and references to the Easement Deed. The third page, "Condition of Property," reiterates the boundary description from Exhibit A and provides one paragraph each describing the "Land Use and Current Use," "Roads and Access," and "Hydrology." Descriptions are limited to "[m]uch of the property" being "grassy pasture" and providing that there are "isolated hardwoods throughout the interior of the property." The roads are described generally as "well-maintained dirt roads," one of which "runs roughly through the center

[*4] of the property." One section, labeled "Improvements," states simply: "Access roads."

The fourth page, "Geological Information," provides information about the general area but no specific facts about the encumbered parcel. The final substantive page consists of three paragraphs, or half a page, describing 60% of the property's soil types; general "Ecological Features" such as "habitat for a variety of birds and game animals"; and "Public Benefits" such as "some viewshed protection," "isolated wetland," and "diminution of downstream flow" to "assist protection of Payne Creek and the marshes associated with it and the Newport River System." The final page, titled "Declaration of Property Condition," provides that an authorized representative of Liberty County acknowledges that the report is an accurate representation of the condition of the encumbered parcel and includes several signatures. There are no attachments or pictures following the report. The Easement Deed authorizes Liberty County to enter the encumbered parcel to conduct inspections to ensure ongoing compliance.

Liberty County is in southeastern coastal Georgia. Hampton Island Preserve, where Cotton Row Farm is located, is approximately 15 miles southeast of Hinesville, the largest city in Liberty County. The area surrounding Hampton Island Preserve is relatively rural and lightly populated. A portion of Hampton Island Preserve has been zoned as a planned unit development (PUD). Cotton Row Farm was never part of the Hampton Island Preserve PUD. The first phase of construction of Hampton Island Preserve, which consisted of 100 acres of lakes, eight miles of limestone road, 20 acres of paddocks, two guest residences, and four miles of trails, was completed in 2005. As of the date the conservation easement was granted, 36 lots and seven farm properties in Hampton Island Preserve had been sold, but only two of the lots had been developed with homes.

Cotton Row Farm is mostly wooded, consisting of premerchantable pine plantations with smaller areas of natural hardwoods and some recently cut areas. It is a quarter mile east of Interstate 95. The nearest interchange to access the interstate is at least four miles away. The public road is accessed via an ingress and egress easement over private property owned by an unrelated party; there is no public road touching Cotton Row Farm.

[*5] B.     *Charitable Contribution Deduction Claimed*

The LLC claimed a charitable contribution deduction of $5,100,000 on its Form 1065, U.S. Return of Partnership Income, for the contribution of the easement to Liberty County for the taxable year ending December 31, 2007.  A Form 8283, Noncash Charitable Contributions, with an appraisal summary was attached to the LLC's 2007 tax return.  The Form 8283 reported that the donated property was a qualified conservation contribution on a 41.201-acre tract of vacant land; that the donation was valued at $5,100,000; and that the property was purchased on December 15, 2006.  The adjusted or cost basis of the donated property was reported as $1,350,000, the cost basis of the entire 85.314-acre contiguous parcel, instead of the cost basis of only the 41.201-acre encumbered parcel.  Petitioners claimed a deduction of $748,702 on their Form 1040X, Amended U.S. Individual Income Tax Return, for the 2007 taxable year resulting from their interest in the LLC's contribution deduction and carried forward the remaining deduction of $4,351,298 to future tax years.[3]

C.     *Expert Valuations*

Each party provided its own expert to value the conservation easement.  There were no sales of comparable conservation easements during the relevant period.  Both experts calculated the fair market value of the easement by subtracting the value of Cotton Row Farm after the granting of the easement from the value before the granting of the easement.

Both experts determined that the highest and best use of Cotton Row Farm before recordation of the Easement Deed was residential subdivision and development.  As of December 2007, the encumbered parcel could be developed into no more than ten subparcels with a minimum lot size of five acres.  However, that restriction would change if the encumbered parcel were to become part of the Hampton Island Preserve PUD.  The experts agreed that when determining the legal permissibility of a particular "highest and best use," the appraiser may consider the likelihood that the subject property could be rezoned to result in a better return on investment.

---

[3] Relevant to the instant case, petitioners carried forward $657,135 of the remaining deduction to their 2010 income tax return, $763,835 to their 2011 income tax return, and $743,862 to their 2012 income tax return.

**[\*6]**   Petitioners' expert, Mr. Miller, applied the income approach[4] to determine the potential value, less expenses, of developing and selling single family homes on Cotton Row Farm.  Mr. Miller concluded that before the Easement Deed, the property could be developed into 42 lots, sold over a period of several years at $400,000 per lot.  Mr. Miller then calculated that the property's value in December 2007, one year after it was sold for $1,350,000, was $7,660,000.

Mr. Miller relied on several steps, each with its own calculation, to arrive at the present value of Cotton Row Farm.  He relied on six lot sales from the Hampton Island Preserve to arrive at the estimated sale price of $400,000 per lot.[5]  He acknowledged that in contrast to the six sold lots, the encumbered parcel lots would lack marshland, a golf course, and lake or river views; provide less privacy; and be farther from existing amenities.  To estimate development costs, Mr. Miller relied on actual costs of the adjacent Hampton Island Preserve development.  He estimated a total cost of $1,316,868, or $31,354 per lot, for 42 lots.  He did not analyze whether Hampton Island Preserve's larger size resulted in per-lot savings unavailable to a smaller development.  He analyzed peak market trends of six coastal area, amenity-based, high-end developments beyond Hampton Island Preserve with absorption rates ranging from 0.82 to 8.87 sales per month, to arrive at an estimated absorption rate of eight lots per year.  On the basis of a survey of discount rates for similar developments in the southeastern United States, Mr. Miller determined that the average discount rate in the third quarter of 2007 was 22.57%; in the calculations for the encumbered parcel, he used a rounded 23% discount rate.

Mr. Miller's analysis relies entirely on development of the LLC's property.  He mischaracterized the zoning of the encumbered parcel but opined that the error did not affect his conclusions because there was a reasonable probability that the property could be rezoned for denser development through incorporation into the Hampton Island Preserve PUD.  Mr. Miller misidentified the property's location in relation to, or

---

[4] Respondent's expert considered and rejected the income approach because Cotton Row Farm was not being used as an income-producing property and did not have a preliminary plat.  He determined that using the development approach "would be speculative and would not improve upon the results" of the sales comparison approach.

[5] Mr. Miller calculated two other potential resale prices: relying on four sales of varied resale lots between April 2003 and July 2007, he calculated a price per lot of $1,749,750; relying on a variety of 42 new lot sales between April 2003 and July 2007, he calculated an average new lot price of $1,166,762.

**[*7]** in other words, its access to, Interstate 95. Nevertheless, he assumed that the encumbered parcel's zoning would be changed and that the increased development would actually occur on the basis of a letter provided by the president of Hampton Island, LLC. The letter waived restrictions on the subdivision pursuant to the declaration of covenants and concluded that the property "shall be subject only to the restrictions of Liberty County." The president of Hampton Island, LLC, has no influence over nor can he overrule Liberty County's zoning regulations. There was no similar document from Liberty County in support of a change in zoning. When the easement was granted, the encumbered parcel had neighboring properties other than those owned by Hampton Island, LLC. There was no document from owners of adjacent properties in support of rezoning the encumbered parcel or its annexation to the Hampton Island Preserve PUD. Mr. Miller described the immediate neighborhood as comprising single family homes.

To test the reasonableness of his value conclusion from the income approach, Mr. Miller analyzed two sales in Hampton Island Preserve. One sale, in April 2003, included a 6,360-square-foot renovated plantation-style home, a 3,520-square-foot guest cottage, a floating boat dock, a floatplane ramp, and a barn. Both properties had marsh and river views. Mr. Miller did not include the 2006 sale of Cotton Row Farm to the LLC as the sale of a comparable property in his test of reasonableness. Mr. Miller did account for some differences in the amenities between the lots whose sales he used for his comparable sales and the potential lots. Of the six adjustments he made, one was downward and he was silent about two others. Overall, the adjustments were made upwards: "Comparable #1" received a net upward adjustment of 60% and "Comparable #2" of 15%. When specifically asked whether he took into account "the marsh view and the golf view, the differences between those developments and the subject property," Mr. Miller acknowledged that it would be "difficult to account for that, because I don't have a development plan."

To determine the present value of the potential residential subdivision and development after encumbrance by the easement, Mr. Miller again applied the income approach. He assumed that Cotton Row Farm would be developed only on the unencumbered parcel into 22 residential lots rather than 42. He determined a value of $3,969,900; the encumbered parcel on its own he valued at $61,800. Although recognizing that the undeveloped nature of the encumbered parcel would be an amenity to the developed unencumbered parcel, he did not increase the value of the unencumbered lots. He calculated the present

[*8] value for the whole property after the granting of the easement to be $4,030,000.

Respondent's expert, Mr. Petkovich, considered the likelihood that the encumbered parcel could be rezoned and developed, and he concluded that using sales of comparable undeveloped properties was the more accurate method of valuation. Mr. Petkovich has experience relying on the reasonably probable legal permissibility of a potential highest and best use to appraise property using reasonably probable facts. One such fact Mr. Petkovich considered in the instant case was access. The encumbered parcel had no road frontage, and without evidence or a description of more access, he could not reasonably assume significant larger scale development of the property. Mr. Petkovich furthermore concluded that the encumbered parcel would not support a more dense development, even if one had been legally permissible, because of the lack of aesthetic features. Nevertheless, Mr. Petkovich recognized that the potential rezoning was feasible to provide a certain premium. Specifically, Mr. Petkovich analyzed the extent to which adding the subject property to the Hampton Island Preserve PUD would increase its value. Mr. Petkovich considered the rate of absorption of lots in Hampton Island Preserve when calculating this premium. Mr. Petkovich determined that the value of Cotton Row Farm, as of the effective date before the conservation easement, was $1,410,000.

Mr. Petkovich determined that after recordation of the Easement Deed, the value of the unencumbered parcel, which could still be developed, and the encumbered parcel, which acted as open space for recreation to benefit the unencumbered parcel, was $940,000. Mr. Petkovich checked his value conclusions by examining a number of purchases of easements to estimate the diminution of value associated with the conservation easement. The purchases of easements supported Mr. Petkovich's determination that the conservation easement resulted in a 90% diminution in value of the encumbered parcel and an overall 33% diminution in value of Cotton Row Farm. By subtracting the "after" value of $940,000 from the "before" value of $1,410,000, Mr. Petkovich concluded that the fair market value of the conservation easement on the effective date was $470,000.

D.    *Notice of Deficiency and Trial*

Respondent mailed to petitioners a notice of deficiency on August 21, 2015, with respect to their taxable years ending December 31, 2010, 2011, and 2012. The only adjustments in the notice were disallowances

**[*9]** of the carryforward deductions resulting from the 2007 charitable contribution deduction and an increase in taxable income resulting from qualified dividend income. Respondent also determined 40% accuracy-related penalties resulting from gross valuation misstatements pursuant to section 6662(h). The notice did not determine or calculate a 20% accuracy-related penalty pursuant to section 6662(a).

On September 20, 2017, seven days before the trial date, respondent provided notice to petitioners of the existence of a Civil Penalty Approval Form approving the penalties in issue. The Standing Pre-Trial Order required that all documents be stipulated or provided to opposing counsel at least 14 days before the trial date (14-day rule). Respondent sought at trial to introduce a signed, sealed, and certified copy of the form, which (1) states that the gross valuation misstatement penalties under section 6662(h) applied to the easement contribution carryforwards to 2010, 2011, and 2012; (2) is signed by the group manager under the heading "Group Manager Approval to Assess Penalties Identified Above"; and (3) is dated October 28, 2014, more than nine months before respondent issued the notice of deficiency to petitioners. Petitioners object to the admission of the form.

OPINION

The notice of deficiency is generally presumed correct, and it is a taxpayer's burden to rebut this presumption. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed.[6] *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). "[D]eductions are strictly construed and allowed only 'as there is a clear provision therefor.'" *Id.* (quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934)).

Section 170 allows individuals to deduct charitable contributions, subject to certain percentage limitations, with a carryover of any excess contributions.[7] *See* § 170(a), (b), (d). Generally, the contribution must consist of the donor's entire interest in the contributed property. § 170(f)(3)(A). However, under section 170(f)(3)(B)(iii), a deduction for a

---

[6] Petitioners do not contend, and the Court does not find, that the burden of proof has shifted pursuant to section 7491(a) on any of the matters before us.

[7] We refer to petitioners' deduction or contribution and the LLC's deduction or contribution interchangeably, as the deductions in issue resulted from petitioners' interest as sole co-owners of the LLC.

**[*10]** partial interest is allowed for a qualified conservation contribution. A qualified conservation contribution is a contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes. § 170(h)(1); Treas. Reg. § 1.170A-14(a). A qualified real property interest is a restriction granted in perpetuity on the use that may be made of real property, including an easement or similar interest. Treas. Reg. § 1.170A-14(b)(2).

I.      *Carryover Charitable Contribution Deductions*

     A.      *Contemporaneously Written Acknowledgement Requirement of Section 170(f)(8)*

Pursuant to section 170(f)(8)(A), "[n]o deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B)." Subparagraph (B) requires in pertinent part that the contemporaneous written acknowledgment (CWA) include the amount of cash and a description of any property other than cash contributed, and whether the donee organization provided any goods or services in consideration for the property. A deed of easement itself may satisfy the CWA requirement of section 170(f)(8). *See, e.g.*, *Averyt v. Commissioner*, T.C. Memo. 2012-198.

In the absence of an explicit statement describing whether the donee provided goods or services in exchange for the charitable contribution, "the deed taken as a whole must prove compliance with section 170(f)(8)(B)(ii)." *French v. Commissioner*, T.C. Memo. 2016-53, at *11–12. "[F]actors that support compliance are that the deed recites no consideration other than the preservation of the property and that the deed contains a provision stating that the deed is the entire agreement of the parties." *Id.* at *12. The deed in *French*

> did not include a provision stating that it is the entire agreement of the parties. Without such a provision, the IRS could not have determined by reviewing the conservation deed whether [the taxpayers] received consideration in exchange for the contribution of the conservation easement. We conclude, therefore, that the conservation deed taken as a whole is insufficient to satisfy section 170(f)(8)(B)(ii).

**[\*11]** *Id*. at \*12–13.  In other words, silence in a deed serves as the CWA that the donee provided no goods or services as consideration, in whole or in part, only if the deed also qualifies that the terms of the deed are the entire agreement.  *See Big River Dev., L.P. v. Commissioner*, T.C. Memo. 2017-166; *310 Retail, LLC v. Commissioner*, T.C. Memo. 2017-164.

The Easement Deed states that the easement was made "for and in consideration of the sum of ten dollars ($10.00) and other good and valuable consideration and in consideration of the covenants, mutual agreements, conditions and promises herein contained."  The Court and the parties agree that such text is tantamount to  boilerplate, which can be ignored.[8]  *See, e.g.*, *RP Golf, LLC v. Commissioner*, T.C. Memo. 2012-282, at \*10 n.7.  The Easement Deed also lacks a merger or entire agreement clause,[9] which is often the provision establishing that a deed constitutes the entire agreement between the parties.  *See, e.g., Big River Dev.,* T.C. Memo. 2017-166, at \*11 ("The deed explicitly stated that '[t]his Deed reflects the entire agreement of [donor] and [donee]' and that '[a]ny prior or simultaneous correspondence, understandings, agreements, and representations are null and void upon execution hereof, unless set out in this instrument.'  The deed of easement thus negated the provision or receipt of any consideration not stated therein."); *310 Retail, LLC*, T.C. Memo. 2017-164, at \*16–17 ("The deed

---

[8] Numerous state courts have also recognized that such text may mean that no real consideration was given, that the consideration was nominal, or that the consideration was substantial but was not disclosed.  *See, e.g.*, *Young v. Fellows*, 37 Conn. L. Rptr. 918 (Conn. Super. Ct. 2004); *Boyers v. Boyers*, 565 S.W.2d 658 (Mo. Ct. App. 1978); *Van Dyke v. Carol Bldg. Co.*, 115 A.2d 607, 609 (N.J. Super. Ct. App. Div. 1955) ("In a deed by one other than a fiduciary the true consideration is usually not stated, but is expressed in the phrase 'One dollar and other good and valuable consideration.'"); *Fry v. Emmanuel Churches of Christ, Inc.*, 839 S.W.2d 406 (Tenn. Ct. App. 1992); *Bale v. Allison*, 294 P.3d 789 (Wash. Ct. App. 2013).

[9] For text recognized as a standard merger clause in Georgia, see *First Data POS, Inc. v. Willis*, 546 S.E.2d 781, 783 (Ga. 2001) ("[The] Agreement . . . constitutes the entire agreement between the parties with respect to the subject matter contained herein and supersedes all prior agreements and understandings, both oral and written by and between the parties hereto with respect to the subject matter hereof."), and *Ainsworth v. Perreault*, 563 S.E.2d 135, 138 (Ga. Ct. App. 2002) ("This Agreement constitutes the sole and entire agreement between the parties hereto and no modification of this Agreement shall be binding unless signed by all parties to this Agreement.  No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto.").  *See also Authentic Agric. Millworks, Inc. v. SCM Grp. USA, Inc.*, 586 S.E.2d 726, 729–30 (Ga. Ct. App. 2003) (discussion of clause held not to be a merger clause).

**[\*12]** explicitly stated that it represented the parties' 'entire agreement' and that '[a]ny prior or simultaneous correspondence, understandings, agreements, and representations are null and void upon execution hereof unless set out in this instrument.' It thus negated the provision or receipt of any consideration not stated therein."); *RP Golf, LLC*, T.C. Memo. 2012-282, at \*10–11 ("[T]he agreement states that it constitutes the entire agreement between the parties regarding the contribution of the conservation easement. The Court therefore holds that the agreement, taken as a whole, states that no goods or services were received in exchange for the contribution."); *Averyt v. Commissioner*, T.C. Memo. 2012-198, 2012 WL 2891077, at \*5 ("Additionally, the conservation deed in the instant case . . . stipulates that the conservation deed constitutes the entire agreement between the parties with respect to the contribution of the conservation easement. Accordingly, the conservation deed, taken as a whole, provides that no goods or services were received in exchange for the contribution.").

Petitioners contend that although the Easement Deed lacks a merger or entire agreement clause, when taken as a whole it nevertheless qualifies its terms as the entire agreement. Specifically, petitioners point to the use of the word "donation" and to two references that the terms of the donation are set forth "herein." We do not find that use of the word "donation" necessarily implies that there was no consideration given, in whole or in part. Neither do we read "herein" to necessarily mean "exclusively herein." Even when taken together, these provisions do not qualify the terms of the Easement Deed as the exclusive and entire agreement.

Petitioners contend that there were, in fact, neither additional negotiations or agreements regarding the terms of the contribution outside of the Easement Deed, nor cash, goods, or services provided by Liberty County to petitioners or the LLC in consideration for the easement donation. Such contentions are irrelevant, however, to determining compliance with the CWA requirement.[10] Proving the facts that should have been included in the CWA cannot replace the strict substantiation requirements of section 170(f)(8). The entire deduction must be disallowed. *See* § 170(f)(8)(A); *Addis v. Commissioner*, 374 F.3d 881, 887 (9th Cir. 2004) ("The deterrence value of section 170(f)(8)'s total

---

[10] Petitioners' contention that they relied upon their tax return preparer and legal advisers to provide all documentation required for them to legally claim the charitable contribution deduction is also irrelevant as there is no professional reliance or reasonable cause exception to the CWA requirement.

**[\*13]** denial of a deduction comports with the effective administration of a self-assessment and self-reporting system."), *aff'g* 118 T.C. 528 (2002).

The Easement Deed does not meet the requirements of section 170(f)(8) and, consequently, cannot serve as the CWA required by the statute. Petitioners do not contend, and we do not find, that any other documents in the record would satisfy the CWA requirement. Petitioners therefore do not satisfy the requirements of section 170(f)(8), and the deductions claimed for the contribution of the conservation easement must be disallowed as a matter of law.

B. *Baseline Document Requirements of Treasury Regulation § 1.170A-14(g)(5).*

Respondent contends that even if petitioners meet the CWA requirement, they fail to meet the requirements of Treasury Regulation § 1.170A-14(g)(5)(i).

The deduction for charitable contributions shall be allowed only if verified under regulations prescribed by the Secretary. § 170(a)(1). When the donor reserves rights the exercise of which may impair the conservation interests of the property, the donor must provide documentation sufficient to establish the condition of the property. Treas. Reg. § 1.170A-14(g)(5)(i). The Baseline Report is the only baseline documentation submitted into evidence. At most, the baseline documentation also includes Easement Deed Exhibit A preceding the Baseline Report. We therefore must address whether these are sufficient, under Treasury Regulation § 1.170A-14(g)(5)(i), to establish the condition of the property at the time of the gift.

The regulation describes the sorts of items that may constitute adequate baseline documentation.[11] The regulation describes examples

---

[11] Section 6001 requires that taxpayers maintain records "sufficient to show whether or not such person is liable for tax" and, in so doing, "comply with such rules and regulations as the Secretary may from time to time prescribe." Treasury Regulation § 1.6001-1(e) requires that such records "shall be retained so long as the contents thereof may become material in the administration of any internal revenue law." This Court has repeatedly held that the burden falls on taxpayers to maintain and present these records. *See, e.g.*, *Bailey v. Commissioner*, T.C. Memo. 2012-96, 2012 WL 1082928, at \*17 ("[T]axpayers are required to retain their books and records as long as they may become material." (citing Treas. Reg. § 1.6001-1(e))), *aff'd*, No. 13-455, 2014 WL 1422580 (1st Cir. Mar. 14, 2014); *Marcus v. Commissioner*, T.C. Memo. 1988-3, 1988 Tax Ct. Memo LEXIS 3, at \*55 ("Obviously, the records must be retained until completion of proceedings in this Court.").

**[\*14]** of information that, if included, would establish the condition of a property at the time of a gift. For example, "survey maps from the United States Geological Survey" could show "the property line and other contiguous or nearby protected areas." The Baseline Report provides a metes and bounds property description but does not include a survey map. Exhibit A includes similarly general maps lacking in detail.

Documentation may include "[a]n aerial photograph of the property at an appropriate scale taken as close as possible to the date the donation is made" or "[o]n-site photographs taken at appropriate locations on the property." Treas. Reg. § 1.170A-14(g)(5)(i)(C) and (D). The Baseline Report includes no photographs.

The regulation provides that the documentation may include:

> A map of the area drawn to scale showing all existing man-made improvements or incursions (such as roads, buildings, fences, or gravel pits), vegetation and identification of flora and fauna (including, for example, rare species locations, animal breeding and roosting areas, and migration routes), land use history (including present uses and recent past disturbances), and distinct natural features (such as large trees and aquatic areas).

*Id.* subdiv. (i)(B). The Baseline Report refers to maps which were not attached. Regarding vegetation, flora, fauna, or distinct natural features, the document identifies the type of soil in only a portion of the property, and it appears to have been based on a review of map data rather than an actual inspection. The only reference to the encumbered parcel's vegetation is that "[m]uch of the property is now grassy pasture. There are isolated hardwoods throughout the interior of the property." The Baseline Report references an "isolated wetland retained in the core of the property" but does not identify its precise location, size, or limits. Petitioners' LLC retains "[t]he right to maintain, or if necessary replace, all existing road beds, paths, and all other land features and or structures." The entire description of the improvements to the easement property is "Access Roads." There is no information regarding the roads' locations, sizes, or conditions.

Petitioners have failed to comply with the requirements in Treasury Regulation § 1.170A-14(g)(5). The purpose of the baseline documentation requirement is "to protect the conservation interests

[*15] associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of the reserved rights." *Id.* subdiv. (i). While the Easement Deed authorizes Liberty County to enter the encumbered parcel to conduct inspections to ensure ongoing compliance, the information in the Baseline Report is insufficient for us to evaluate whether changes fall within the limits of the reserved rights. The deed allows for the harvesting of forests on the property but only for construction of two paddocks. The document does not describe the sizes or locations of the forests, so it would be at minimum difficult and at maximum impossible to gauge whether the amount harvested was reasonable for the construction of two paddocks. The deed prohibits petitioners' LLC from "[d]iking, draining, filling, dredging or removal of wetlands." The Baseline Report does not provide a map or sufficiently detailed descriptions to establish the wetlands' location, size, or limits at or near the time of the gift, so it would be difficult to impossible to identify any change. The property owners may maintain or replace existing roads, but without knowing the location of the access roads at the time of the donation, it is difficult or impossible to prove whether a new road replaces an old one. The requirement that the property owner alert Liberty County to any exercise of the reserved rights is insufficient; it relies on the property owner to police itself when it is precisely their actions which the baseline requirement is intended to police.

The deficiencies in the Baseline Report undermine the protection of the conservation interests associated with the encumbered parcel and cannot be said to comply with the regulation's requirements. Accordingly, this is also a basis on which petitioners' LLC's claimed deduction must be disallowed.

C. *Substantiation Requirements of Treasury Regulation § 1.170A-13(c).*

Congress acted to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 155(a), 98 Stat. 494, 691–92. In relevant part the statute requires anyone claiming a deduction under section 170 for a contribution of property valued at more than $5,000 to attach an appraisal summary and include certain information, including the cost basis and acquisition date of the contributed property, to the return on which the deduction is first claimed.

16

**[\*16]** Instead of reporting its basis solely in the 41.201-acre parcel over which it granted an easement, the LLC reported its basis in the entire 85.314 acres purchased in 2006.  The LLC therefore reported a basis of roughly twice its actual basis in the encumbered parcel.

The purpose of the requirement to report cost basis in donated property was "to alert the Commissioner, in advance of audit, of potential overvaluations of contributed property and thereby deter taxpayers from claiming excessive deductions in the hope that they would not be audited." *RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 16–17 (2017) (first citing Staff of S. Comm. on Finance, 98th Cong., S. Prt. No. 98-169 (Vol. 1), at 444 (Comm. Print 1984); then citing Staff of J. Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 503–04 (Comm. Print 1984); and then citing *Hewitt v.* Commissioner, 109 T.C. 258, 264 (1997), *aff'd*, 166 F.3d 332 (4th Cir. 1998)), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019).  Respondent contends that by reporting a cost basis of more than twice its actual basis, the LLC failed to alert the IRS to the extent of its potential overvaluation, thereby defeating the purpose of the requirement.  Further, respondent contends that this error leaves the appraisal summary in less than the fully completed state required by the regulations, *see* Treas. Reg. § 1.170A-13(c)(2)(i), and that therefore the claimed deduction must be disallowed.

The failure to fully complete an appraisal as required by Treasury Regulation § 1.170A-13(c)(2)(i) may be independently sufficient to warrant disallowance of the deduction.  *See* § 170(f)(11)(A)(i). Petitioners might be allowed a deduction despite the shortcomings, however, if their failure was due to "reasonable cause and not to willful neglect." *See* § 170(f)(11)(A)(ii)(II).  "Reasonable cause" requires a taxpayer to exercise ordinary business care and prudence. *See, e.g.*, *United States v. Boyle*, 469 U.S. 241, 246 (1985); *Presley v. Commissioner*, T.C. Memo. 2018-171, at \*66, *aff'd*, 790 F. App'x 914 (10th Cir. 2019).  Whether a taxpayer had reasonable cause is a fact-intensive inquiry that requires examination of all the facts and circumstances.  *Presley*, T.C. Memo. 2018-171, at \*66; *Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*99.  If a taxpayer alleges reliance on the advice of an accountant, return preparer, or other tax professional, the taxpayer must show that he "actually relied in good faith on the professional's advice." *Crimi*, T.C. Memo. 2013-57, at \*99; *see Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); Treas. Reg. § 1.6664-4(c)(1)

**[\*17]** (requiring that the taxpayer have "reasonably relied in good faith on [the] advice").

Petitioners contend that reporting the $1,350,000 cost basis of the entire 85.314-acre property, rather than only the cost basis of the 41.201-acre encumbered parcel, was a scrivener's error. They further contend that despite this error, they provided sufficient information in the rest of the return and attachments to adequately disclose the relevant facts of their conservation easement donation.

We have held that Congress specifically passed DEFRA's heightened substantiation requirements to prevent the Commissioner from having to sleuth through the footnotes of millions of returns. *Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at \*20. We cannot find that, in reporting roughly twice the accurate cost basis, petitioners substantially complied with DEFRA. *See Loube v. Commissioner*, T.C. Memo. 2020-3, at \*22-23. Accordingly, petitioners failed to meet the requirements of Treasury Regulation § 1.170A-13(c)(2)(i), and this is also a basis on which the deduction must be disallowed.

## II. *Penalties*

For each of the years in issue, respondent determined in the notice of deficiency a 40% accuracy-related penalty resulting from a gross valuation misstatement pursuant to section 6662(h). The Commissioner bears the burden of production with respect to an individual's liability for any penalty, including the accuracy-related penalty. § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). To meet that burden, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty. *Higbee v. Commissioner*, 116 T.C. at 446. Once the Commissioner has met the burden of production, the taxpayer bears the burden of proving that the penalty is inappropriate. *See* Rule 142(a); *Higbee*, 116 T.C. at 446–49.

### A. *Respondent's Burden of Production: Section 6751(b)(1)*

Respondent's burden of production includes showing proper written approval of the initial penalty determination by an immediate supervisor. § 6751(b)(1).

The Standing Pre-Trial Order required that all documents be stipulated or provided to opposing counsel by September 13, 2017, the last day under the 14-day rule. Respondent did not stipulate or provide

**[\*18]** the Civil Penalty Approval Form (Approval Form) to petitioners' counsel by September 13, 2017. Pursuant to Rule 131(b), an unexcused failure to comply with a standing pretrial order may subject a party to sanctions. One such sanction may be the exclusion of evidence offered in violation of the 14-day rule. *Kanofsky v. Commissioner*, T.C. Memo. 2006-79, *aff'd*, 271 F. App'x 146 (3d Cir. 2008). In weighing the appropriate sanction for violation of the 14-day rule, the Court considers whether the opposing party was prejudiced by the failure. *See Thompson v. Commissioner*, T.C. Memo. 2011-291, 2011 WL 6382704, at \*2 ("The pretrial order does not mandate exclusion . . . ."); *Morris v. Commissioner*, T.C. Memo. 2008-65, 2008 WL 704208, at \*1, *aff'd*, 431 F. App'x 535 (9th Cir. 2011).

Petitioners contend that respondent's violation of the 14-day rule prevented them from asserting a defense that respondent had failed to satisfy his burden and thus resulted in significant prejudice. Petitioners also contend that accepting the Approval Form would result in the imposition of the penalty against petitioners without following required procedure. Since *Graev v. Commissioner*, 149 T.C. 485 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016), wherein we required the Commissioner to come forward with sufficient evidence indicating that the imposition of a penalty subject to section 6751(b)(1) was approved properly under this section, this Court has routinely found that reopening the record to admit the Civil Penalty Approval Form into evidence serves the interest of justice and is not prejudicial. *See, e.g.*, *Degourville v. Commissioner*, T.C. Memo. 2022-93. Petitioners did not raise compliance with section 6751(b)(1) before or, substantively, during trial and nevertheless received the form before the record was closed. It is therefore even more appropriate to accept the form into evidence.

Accordingly, respondent has met his burden of production as to the penalty. We conclude that the requirements of section 6751(b)(1) have been met because the Civil Penalty Approval Form shows written supervisory approval of the initial penalty determination before issuance of the notice of deficiency, and petitioners have not shown that approval was actually required before that date. *See Frost v. Commissioner*, 154 T.C. 23, 34–35 (2020); *Hatfield v. Commissioner*, T.C. Memo. 2022-59, at \*7.

B.     *Gross Valuation Misstatement*

We have held that petitioners are not entitled to the carryover charitable contribution deductions and that there is consequently an

**[\*19]** underpayment of tax on each of petitioners' returns in issue. Section 6662(h)(1) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, one or more gross valuation misstatements. A gross valuation misstatement includes any valuation misstatement where the value of the property claimed on the tax return is 200% or more of the correct value. § 6662(h)(2)(A). The taxpayer may not rely on a reasonable cause, good-faith defense against imposition of the section 6662(h) penalty with respect to gross valuation misstatements of charitable contribution properties. § 6664(c)(2); *Chandler v. Commissioner*, 142 T.C. 279, 293 (2014). If imposed, the penalty is 40% of the portion of the underpayment of tax to which the section applies. § 6662(h)(1).

The amount of a charitable contribution deduction pursuant to section 170(a) is the fair market value of the donated property at the time of the charitable contribution. Treas. Reg. § 1.170A-1(c)(1). The regulations define fair market value as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* subpara. (2). Relevant to the instant case, the value of a conservation easement donation is "the fair market value of the perpetual conservation restriction at the time of the contribution." Treas. Reg. § 1.170A-14(h)(3)(i). Respondent must therefore show that petitioners' valuation of the conservation easement was 200% or more of the correct valuation. *See 6611, Ltd. v. Commissioner*, T.C. Memo. 2013-49, at \*75.

Petitioners' LLC claimed on its 2007 return[12] that the conservation easement in issue had a fair market value of $5,100,000. For the penalties to apply, we would have to find that the value of the conservation easement was $2,550,000 or below. Petitioners now contend the easement value at the time of donation was $3,630,000. Respondent contends the easement value was $470,000.

The fair market value of the easement is based on the sale prices of comparable easements if there exists a substantial record of sales of comparable easements. Treas. Reg. § 1.170A-14(h)(3)(i). When, as here,

---

[12] The section 6662(h) gross valuation misstatement penalty applies to any portion of an underpayment for a year to which a deduction is carried that is attributable to a gross valuation misstatement for the year in which the carryover of the deduction arises. *Fakiris v. Commissioner*, T.C. Memo. 2017-126, at \*30, *supplemented by* T.C. Memo. 2020-157; Treas. Reg. § 1.6662-5(c).

**[\*20]** there is not a substantial record of comparable easement sales,[13] "the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered parcel after the granting of the restriction." *Id.* In a case such as this involving a conservation restriction covering property that is contiguous to property owned by a donor, "[t]he amount of the deduction . . . is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction." *Id.* We therefore must value the encumbered and unencumbered parcels combined before and after the granting of the easement.

Where the "before and after" analysis is used, "the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed." *Id.* subdiv. (ii). Additionally, if the conservation easement "allows for any development, however limited, on the property to be protected, the fair market value of the property after contribution of the restriction must take into account the effect of the development." *Id.*

We agree with the determination made by respondent's expert, Mr. Petkovich, that the value of the subject property as of the effective date before the conservation easement was $1,410,000. This valuation is consistent with the $1,350,000 price petitioners paid for the subject property only one year earlier in an arm's-length transaction for cash. His valuation explicitly accounted for the possibility of the property's being annexed and developed into the Hampton Island Preserve PUD.

We also agree with Mr. Petkovich's assessment that the income approach was too speculative to yield an accurate valuation. The Court has upheld the application of the income approach when valuing easements with a highest and best use as subdivision development. *See, e.g.*, *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, *aff'd*, 493 F. App'x 944 (10th Cir. 2012); *Kiva Dunes Conservation, LLC v.*

---

[13] As stated in the Findings of Fact, Mr. Petkovich did examine a number of purchases of comparable easements to check his valuation. Although the number of purchases was not substantial, the values involved supported Mr. Petkovich's determination, discussed below, that the conservation easement resulted in a 90% diminution in value of the encumbered parcel and an overall 33% diminution in value of Cotton Row Farm.

**[\*21]** *Commissioner*, T.C. Memo. 2009-145, 2009 WL 1748862. When the income approach is used, the Court examines the critical assumptions made by each expert appraiser to decide the plausibility of those assumptions in reaching the appropriate values. *Kiva Dunes Conservation, LLC v. Commissioner*, 2009 WL 1748862, at \*4. The assumptions made by petitioners' expert, Mr. Miller, are insufficiently plausible to support his valuation.[14] Mr. Miller did not cite any reason, and petitioners provided no support, for the contention that Liberty County would approve a zoning change. He also provided no basis, and petitioners provided no evidence, for presuming that neighboring property owners who granted easement access to the nearest highway and main roadway would support such development. The letter from the Hampton Island, LLC, president does not speak to either of these barriers to development. Furthermore, Mr. Miller himself recognized the difficulty in accounting for the difference between a property being valued and comparable properties when there is no development plan.

Even if we were to find that development was plausible, Mr. Miller's calculations include significant errors inflating his valuation. Mr. Miller incorrectly identified the zoning of the subject property; stated an incorrect location of the subject property in relation to Interstate 95; and identified the immediate neighborhood as comprising single family homes when all of Hampton Island Preserve had only two homes built at the time of the easement donation. He insufficiently accounted for differences between comparable developments and the subject property because he had no development plan. Using the development costs from Hampton Island Preserve was unreasonable without adjusting for the fact that the per-unit development cost would be higher for a smaller development. Furthermore, he erred on the highest possible number of lot developments and the highest possible absorption rate and rounded up the discount ratio. Even in analyzing sales of comparable properties to verify the reasonableness of his

[14] Respondent contends that the Court should exercise its authority to reject Mr. Miller's opinion as to the value of the conservation easement in full because he has a history of dishonesty; he plagiarized portions of his report; and the report includes errors of both commission and omission which culminate in a conclusion of value that is incredible. *See, e.g.*, *Chiu v. Commissioner*, 84 T.C. 722 (1985) (rejecting an expert's testimony as incredible when the expert's opinion of value was so exaggerated as to make it unrealistic); *Fuchs v. Commissioner*, 83 T.C. 79, 99 (1984); *Dean v. Commissioner*, 83 T.C. 56, 75 (1984); *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980) (finding that experts may lose their usefulness when they merely become advocates for the position argued by a party). We need not rule on the contention, as we find Mr. Petkovich's analysis to be correct on the merits.

[*22] valuation, Mr. Miller used extreme examples and figures. One of only two sales he relied on for his calculation occurred more than four years before the effective date of the easement deed and included significant improvements. The values of both properties were adjusted upwards, one by 60%. He ignored the fact that the 2006 sale of the property in issue would have provided an arm's-length and very appropriate comparable to a theoretical sale in 2007.

We agree with respondent's contention that aside from the issues detailed above, Mr. Miller's ultimate conclusion appears incredible as a practical matter. He determined a fair market value for the conservation easement, a subset of property rights, nearly six times the per-acre amount for which the LLC had purchased the fee simple interest in Cotton Row Farm just 377 days earlier. We agree with Mr. Petkovich's assessment that subtracting the after value of $940,000 from the before value of $1,410,000 yields a fair market value for the conservation easement of $470,000 on its effective date. Accordingly, we hold that petitioners are liable for the 40% accuracy-related penalty resulting from a gross valuation misstatement pursuant to section 6662(h) as determined for each of the years in issue.

To reflect the foregoing,

*Decision will be entered for respondent.*